ASSOCIATED INDUSTRIES OF MISSOURI ET AL. *v.*
LOHMAN, DIRECTOR OF REVENUE OF MISSOURI,
ET AL.

No. 93–397.   Argued March 28, 1994—Decided May 23, 1994

Thomas, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Stevens, O'Connor, Scalia, Kennedy, Souter, and Ginsburg, JJ., joined. Blackmun, J., concurred in the judgment.

*Thomas C. Walsh* argued the cause for petitioners. With him on the briefs were *Juan D. Keller, Michael G. Biggers,* and *Brenda L. Talent.*

*Don M. Downing,* Deputy Attorney General of Missouri, argued the cause for respondents. With him on the brief for respondent Lohman were *Jeremiah W. (Jay) Nixon,* At-

torney General, and *Gretchen Garrison* and *Jeffrey K. Elnicki*, Assistant Attorneys General. *George Alex Bartlett, Clifton S. Elgarten*, and *Stuart H. Newberger* filed a brief for respondents Delong's Incorporated et al.*

JUSTICE THOMAS delivered the opinion of the Court.

The State of Missouri imposes a uniform, statewide use tax on all goods purchased outside the State and stored, used, or consumed within the State. Although the tax is purportedly designed to "compensate" for sales taxes imposed by local jurisdictions on sales of goods in the State, local sales tax rates vary widely, and in many jurisdictions the use tax exceeds the sales tax. Petitioners contend that this system discriminates against interstate commerce in violation of the Commerce Clause, even though the local sales taxes across the State may, in the aggregate, place a greater burden on intrastate trade than the uniform use tax places on interstate trade. We agree that, in localities where the use tax exceeds the sales tax, the system is impermissibly discriminatory, and we therefore reverse the judgment of the Supreme Court of Missouri.

I

Missouri has a multitiered system of sales and use taxes. The State imposes by statute a tax of 4% on all sales of personal property in the State, Mo. Rev. Stat. § 144.020 (1986), and, through provisions in the State Constitution, provides for additional sales taxes of one-eighth of one percent and one-tenth of one percent on the same transactions. Mo. Const., Art. IV, §§ 43(a), 47(a). These levies are exactly

---

*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of St. Louis et al. by *Nancy Kelley Yendes;* for the Multistate Tax Commission by *Alan H. Friedman* and *Paull Mines;* and for the National Conference of State Legislatures et al. by *Richard Ruda* and *Lee Fennell.*

paralleled by statutory and state constitutional provisions providing for use taxes of 4%, one-eighth of one percent, and one-tenth of one percent, respectively, on the "privilege of storing, using or consuming" within the State any article of personal property purchased outside the State. Mo. Rev. Stat. § 144.610(1) (1986); Mo. Const., Art. IV, §§ 43(a), 47(a).[1] Thus, under these various provisions, the State imposes a statewide sales tax of 4.225% on sales of goods within the State and a statewide use tax of 4.225% on goods brought into the State after being purchased elsewhere. These taxes are not challenged here.

The State also imposes an "additional use tax" of 1.5% on the privilege of storing, using, or consuming within the State any article of personal property purchased outside the State. Mo. Rev. Stat. § 144.748 (Supp. 1993).[2] This use tax is not paired with any sales tax at the state level. The State, however, authorizes political subdivisions, including counties and incorporated municipalities, to impose a local sales tax.[3] Over 1,000 localities have used that authority to enact sales taxes ranging from 0.5% to 3.5%, while at least one county has no local sales tax at all.

Petitioner Associated Industries of Missouri is a trade association representing businesses that operate in Missouri and businesses that sell to customers in Missouri. Out-of-state members of the organization must collect the additional

---

[1] Although the use taxes literally apply to all products to be used, stored, or consumed in the State, § 144.615(2) provides an exemption for all goods subject to the Missouri sales tax—that is, goods purchased within the State—and the constitutional provisions incorporate by reference the same exemption. See Mo. Const., Art. IV, §§ 43(a), 47(a).

[2] Section 144.748(2) incorporates by reference the same exemption contained in § 144.615(2). See n. 1, *supra*. Because only the 1.5% additional use tax imposed by § 144.748, not the 4.225% use tax described above, is at issue in this case, references below to the "use tax" should be understood to refer to the 1.5% additional use tax.

[3] See, *e. g.*, Mo. Rev. Stat. §§ 66.600–66.630; 67.500–67.545; 92.400–92.420; 94.500–94.510; 94.600–94.655; 94.700–94.745 (1986 and Supp. 1993).

use tax on sales made into the State. Petitioner Alumax Foils, Inc., is a manufacturing firm in Missouri that pays the additional use tax on goods purchased from outside the State. Petitioners brought this action in state court contending that the use tax impermissibly discriminates against interstate commerce in violation of the Commerce Clause. The State Circuit Court rejected petitioners' claims and granted respondents' motion for summary judgment.

The Supreme Court of Missouri affirmed. 857 S. W. 2d 182 (1993). The court noted that the 1.5% use tax had been imposed to equalize taxes on in-state and out-of-state goods. Previously, political subdivisions of the State had imposed local sales tax burdens that were not paralleled by any use tax. Because the tax was designed to even exactions on intrastate and interstate trade, the court reasoned that the scheme should be analyzed under the "compensatory tax" doctrine, which the court summarized as permitting States to "impose . . . equivalent burden[s]" on transactions in local and interstate commerce. *Id.*, at 187.

The court acknowledged that, in 53.5% of local taxing jurisdictions, the 1.5% use tax exceeded the local sales tax. See *id.*, at 185, n. 3. But the court emphasized that 1990 sales figures from the stipulated record showed that over 93% of the dollar volume of sales in the State occurred in jurisdictions where the local sales tax exceeded the use tax. See *id.*, at 185. Calculating from similar figures, the court determined that, had a flat local sales tax of 1.5%—exactly equivalent to the use tax—been imposed in 1990, it would have *reduced* the sales tax burden on in-state sales by $100 million. *Ibid.* In short, the court concluded that given the high average rate of local sales taxes, the overall effect of the use tax scheme across the State was to place a lighter aggregate tax burden on interstate commerce than on intrastate commerce.

After rehearsing these facts, the court stated the issue before it as being whether "a state use tax may impose a

greater burden than the various sales taxes in specific locali-ties, if on a statewide basis the use tax imposes a lesser over-all burden than do all the various sales taxes." *Id.,* at 186. Relying on this Court's decision in *General American Tank Car Corp.* v. *Day,* 270 U. S. 367 (1926), the court answered that question in the affirmative. The court reasoned that whether the tax scheme discriminated against interstate commerce should be determined on the basis of a comparison of the overall effects of the use tax and the local sales taxes on interstate commerce statewide. Because the figures out-lined above suggested that, in the aggregate, the tax scheme imposed greater burdens on intrastate than on interstate commerce, the court concluded that the tax avoided discrimi-nation on a statewide basis and thus did not violate the dic-tates of the Commerce Clause. 857 S. W. 2d, at 187–192.

In dissent, then-Chief Justice Robertson criticized the court's focus on averaging effects across the State to deter-mine whether there was discrimination and suggested that the majority's method was tantamount to basing constitu-tional analysis on a conclusion that the use tax scheme was "'close enough for government work.'" *Id.,* at 195. Chief Justice Robertson concluded that this Court's cases con-tained a strict rule of equality that demanded equal treat-ment of local and interstate commerce in each local juris-diction, not merely in the overall result for the State. *Id.,* at 199.

We granted certiorari, 510 U. S. 1009 (1993), to consider the validity of the 1.5% use tax.

## II

Although the Commerce Clause is phrased merely as a grant of authority to Congress to "regulate Commerce . . . among the several States," Art. I, § 8, cl. 3, it is well estab-lished that the Clause also embodies a negative command forbidding the States to discriminate against interstate trade. See, *e. g., Oregon Waste Systems, Inc.* v. *Department*

*of Environmental Quality of Ore., ante,* at 98; *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 273 (1988). The Clause prohibits economic protectionism—that is, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.,* at 273–274. Thus, we have characterized the fundamental command of the Clause as being that "a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State," *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 642 (1984), and have applied a "virtually *per se* rule of invalidity" to provisions that patently discriminate against interstate trade, *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978).

### A

By its terms, the additional use tax at issue in this case appears to violate the Commerce Clause's cardinal rule of nondiscrimination, for it exempts from its scope all sales of goods occurring within the State. See n. 2, *supra.* Nevertheless, our cases establish that such a levy may be saved from constitutional infirmity if it is a valid "compensatory tax" designed simply to make interstate commerce bear a burden already borne by intrastate commerce. Under the compensatory tax doctrine, a facially discriminatory tax that imposes on interstate commerce the equivalent of an "identifiable and substantially similar tax on intrastate commerce does not offend the negative Commerce Clause." *Oregon Waste, ante,* at 103 (internal quotation marks omitted). To ensure that the State is indeed merely imposing countervailing burdens on comparable transactions, we have required that the taxes on interstate and intrastate commerce be imposed on "substantially equivalent event[s]." *Maryland* v. *Louisiana,* 451 U. S. 725, 759 (1981). See also *Armco, supra,* at 643. The end result under the theory of the compensatory tax is that, "[w]hen the account is made up, the stranger from afar is subject to no greater burdens . . . than the dweller within the gates. The one pays upon one activ-

ity or incident, and the other upon another, but the sum is the same when the reckoning is closed." *Henneford* v. *Silas Mason Co.*, 300 U. S. 577, 584 (1937).

To justify any levy as a compensatory tax, "a State must, as a threshold matter, 'identif[y] . . . the [intrastate tax] burden for which the State is attempting to compensate.'" *Oregon Waste, ante,* at 103 (quoting *Maryland, supra,* at 758). Respondents urge that the local sales taxes imposed by over a thousand political subdivisions within the State provide the burden on intrastate commerce that Missouri seeks to counterbalance through the use tax in this case. There is no dispute that sales taxes and use taxes such as those at issue here are imposed on "substantially equivalent event[s]." *Maryland, supra,* at 759. *Silas Mason* itself approved a system of sales and use taxes, and we have recognized that "[a] use tax is generally perceived as a necessary complement to [a] sales tax." *Williams* v. *Vermont,* 472 U. S. 14, 24 (1985). Cf. *Halliburton Oil Well Cementing Co.* v. *Reily,* 373 U. S. 64, 66 (1963) ("[T]he purpose of such a sales-use tax scheme is to make all tangible property used or consumed in the State subject to a uniform tax burden irrespective of whether it is acquired within the State . . . or from without the State").

Missouri's use tax scheme, however, runs afoul of the basic requirement that, for a tax system to be "compensatory," the burdens imposed on interstate and intrastate commerce must be equal. As we observed in *Maryland* v. *Louisiana,* the "common thread running through the cases upholding compensatory taxes is the equality of treatment between local and interstate commerce." 451 U. S., at 759. See also *Halliburton, supra,* at 70 ("[E]qual treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state"). Where a State imposes equivalent sales and use taxes, we have upheld the system under the Commerce Clause. See *Silas Mason, supra,* at 584–587. But in Mis-

souri, whether the 1.5% use tax is equal to (or lower than) the local sales tax is a matter of fortuity, depending entirely upon the locality in which the Missouri purchaser happens to reside. Where the use tax exceeds the sales tax, the discrepancy imposes a discriminatory burden on interstate commerce. Out-of-state goods brought into such a jurisdiction are subjected to a higher levy than are goods sold locally. The resulting disparity is incompatible with what we have termed the "strict rule of equality adopted in *Silas Mason*." *Halliburton, supra,* at 73.

Respondents contend that the foregoing analysis is too myopic—that in reckoning the balance of accounts alluded to in *Silas Mason* we should focus, not on each political subdivision in which a disparity between the two taxes may result in discrimination against interstate commerce, but rather on the overall impact of the use tax and the various sales taxes on interstate commerce across the State as a whole. Respondents' theory assumes that discrimination in some parts of a state tax system may be permissible under the Commerce Clause as long as it is of a sufficiently limited magnitude to be offset by preferential treatment for interstate trade in other portions of the tax scheme. There is no question that, within a locality where the use tax exceeds the sales tax, the tax structure discriminates against interstate trade. Respondents merely argue that the local jurisdiction provides too narrow a framework for proper constitutional analysis.

We have never suggested, however, that patent discrimination in part of the operation of a tax scheme, not directly justified under any theory such as the compensatory tax doctrine, can be rendered inconsequential for Commerce Clause purposes by advantages given to interstate commerce in other facets of a tax plan or in other regions of a State. On the contrary, as a general matter we have rejected reliance on any calculus that requires a quantification of discrimination as a preliminary step to determining whether the discrimination is valid. Under our cases, unless one of several

narrow bases of justification is shown, see *Oregon Waste, ante,* at 100–101, actual discrimination, wherever it is found, is impermissible, and the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred. See *Wyoming* v. *Oklahoma,* 502 U. S. 437, 454–455 (1992); *New Energy Co.,* 486 U. S., at 276; *Maryland, supra,* at 760.

Moreover, two Terms ago we implicitly rejected any theory that would require aggregating the burdens on commerce across an entire State to determine the constitutionality of a burden on interstate trade imposed by a particular political subdivision of the State. We concluded that proper analysis of the practice of one county that discriminated against interstate trade was "unaffected by the fact that some other counties [in the State] ha[d] adopted a different policy." *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources,* 504 U. S. 353, 363 (1992). Contrary to respondents' suggestions, our reasoning indicates that discrimination is appropriately assessed with reference to the specific subdivision in which applicable laws reveal differential treatment.

Any other approach would frustrate the Commerce Clause's central objective of securing a national " 'area of free trade among the several States.' " *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 328 (1977) (quoting *McLeod* v. *J. E. Dilworth Co.,* 322 U. S. 327, 330 (1944)). Under respondents' view, the Commerce Clause would interpose no bar to the systematic subdivision of the national market through discriminatory taxes as long as the taxes were imposed by counties, rather than by States—and provided, of course, that on balance each *State* as a whole did not discriminate against interstate trade. Such a rule "would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951). We have never suggested that the Commerce Clause will tolerate such dis-

crimination. Rather, "our prior cases teach that a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself." *Fort Gratiot, supra,* at 361.

Respondents contend that their proposed method of assessing discrimination on a statewide basis also finds support in our cases and, following the Supreme Court of Missouri, rely on our decision in *General American Tank Car Corp.* v. *Day,* 270 U. S. 367 (1926). *General American* involved a challenge to a Louisiana property tax scheme under which nondomiciliaries of the State were taxed at a rate of 25 mills on the dollar, while domiciliaries were taxed at a rate determined by their parish of domicile. See *id.,* at 370–371. Even though some parish tax rates were less than 25 mills on the dollar, the Court did not strike down the tax. The decision, however, does not provide controlling Commerce Clause analysis for this case.

Although *General American* involved both Commerce Clause and Equal Protection Clause challenges, it was only in analyzing the tax in question under the Equal Protection Clause that we engaged in the aggregating analysis respondents urge on us under the Commerce Clause today. Noting that, considered together, the parish taxes "average[d] approximately twenty-five mills," we concluded that "in substance" the scheme did not discriminate against nondomiciliaries and that it was not "invalid merely because equality in its operation as compared with local taxation has not been attained with mathematical exactness." *Id.,* at 373. We reasoned that, "[i]n determining whether there is a denial of equal protection of the laws by such taxation, we must look to the fairness and reasonableness of its purposes and practical operation, rather than to minute differences between its application in practice and the application of the taxing statute or statutes to which it is complementary." *Ibid.*

It might be argued that the assessment of equal treatment in *General American* was a final step in the Court's Commerce Clause analysis as well, for the discussion followed upon the conclusion that the Louisiana scheme survived Commerce Clause scrutiny "unless it operate[d] to discriminate in some substantial way between" domiciliaries and nondomiciliaries. *Id.*, at 372. But even if that were so, the *General American* approach to averaging burdens on interstate and intrastate commerce, which Chief Justice Robertson aptly characterized as a rule of " 'close enough for government work,' " 857 S. W. 2d, at 195, never took root in our Commerce Clause jurisprudence. To the extent that *General American's* Equal Protection Clause discussion ever could have been read as suggesting appropriate Commerce Clause analysis, it has been bypassed by later decisions, and particularly by the "strict rule of equality adopted in *Silas Mason*," *Halliburton*, 373 U. S., at 73, a rule that has controlled compensatory tax cases for over half a century. In *Silas Mason*, Justice Cardozo was explicit in explaining for the Court that the compensatory tax doctrine requires precision to ensure that, upon the "reckoning" of "account[s]," the "sum" on the interstate side of the ledger is "the same" as that on the intrastate side. 300 U. S., at 584. More recently, we have reiterated that strict parity is demanded by the compensatory tax doctrine as we have explained that a compensatory tax leaves a consumer free to make choices "without regard to the tax consequences"; if he purchases within the State he may pay a tax, but if he purchases from outside the State he will pay a "tax of the *same amount.*" *Boston Stock Exchange, supra*, at 332 (emphasis added).[4]

---

[4] Of course, in focusing on equality, our cases have addressed the *limit* of permissible state regulation of interstate commerce. In setting the limit at equality, we have not suggested that lesser burdens on interstate trade are impermissible; that is, we have not demanded equality *and nothing but equality* in compensatory tax cases.

Respondents' final defense of the use tax is an appeal to Missouri's pure motives: that is, its lack of any intent to discriminate. As the product of a decentralized decision-making process that relies on the independent judgment of hundreds of local jurisdictions, the use tax scheme, in respondents' view, cannot reveal any overall design on the part of the State or any other governmental entity to disfavor interstate trade. In fact, respondents urge that holding this scheme unconstitutional would effectively eliminate the State's ability to delegate taxing authority to local jurisdictions. But a court need not inquire into the purpose or motivation behind a law to determine that in actuality it impermissibly discriminates against interstate commerce. See, e. g., *Philadelphia*, 437 U. S., at 626 (describing "legislative purpose" as "not . . . relevant to the constitutional issue to be decided"); *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 352–353 (1977). See also *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S. 334, 340–342 (1992).

It should be apparent that in holding this scheme unconstitutional we impose no new restrictions on the State's power to delegate its taxing authority as it sees fit. What a State may not do is appeal to decentralized decisionmaking to augment its powers: It may not grant its political subdivisions a power to discriminate against interstate commerce that the State lacked in the first instance.

The State remains free to authorize political subdivisions to impose sales or use taxes, as long as discriminatory treatment of interstate commerce does not result. Other States apparently have had little difficulty in combining some local autonomy with the commands of the Commerce Clause. As the parties stipulated, App. 35, 28 States that provide political subdivisions some authority to impose use taxes have devised systems to ensure that use taxes are not higher than sales taxes within the same taxing jurisdiction. See, e. g.,

Ga. Code Ann. § 48–8–110 (Supp. 1994) (requiring the enactment of a local use tax to be coupled with the adoption of an equivalent sales tax).

### B

As our discussion above makes clear, Missouri's use tax scheme impermissibly discriminates against interstate commerce only in those localities where the local sales tax is less than 1.5%. Apparently hoping to obtain a refund for all moneys paid under the use tax, however, petitioners seek to have the tax struck down in its entirety. They urge us to hold that the tax is facially invalid in every jurisdiction because there is no countervailing statewide sales tax and no legislation ensuring that local sales taxes will always equal or exceed the use tax. The evil of the system, under this view, is not merely the actual discrimination that results in some localities, but the potential for discrimination in every locality. Indeed, the logic of petitioners' theory suggests that the potential for abuse would make Missouri's use tax scheme impermissibly discriminatory even if every political subdivision had chosen to impose a sales tax of greater than 1.5%.

But we have never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands. On the contrary, we repeatedly have focused our Commerce Clause analysis on whether a challenged scheme is discriminatory in "effect," see, *e. g.,* *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263, 270 (1984), and we have emphasized that "equality for the purposes of . . . the flow of commerce is measured in dollars and cents, not legal abstractions." *Halliburton,* 373 U. S., at 70. See also *Gregg Dyeing Co.* v. *Query,* 286 U. S. 472, 481 (1932) ("Discrimination, like interstate commerce itself, is a practical conception. We must deal in this matter, as in others, with substantial distinctions and real injuries"). A purely nominal distinction in a State's statutes between the methods of

regulating intrastate and interstate commerce, as long as it is not translated into any difference in the substance of regulations imposed, cannot be said to provide "benefit[s]" to intrastate commerce or to impose discriminatory "burden[s]" on interstate trade. *New Energy*, 486 U. S., at 273. Thus, it would not violate the Commerce Clause.

For similar reasons, the mere fact that determining the compensatory character of the use tax in this case requires consideration of the sales taxes levied by hundreds of local jurisdictions does not mean that the use tax should be rejected *in toto* as facially discriminatory. A compensatory tax and the tax for which it compensates need not be promulgated in the same provision of state law, or even through the same governmental entity, to survive Commerce Clause scrutiny. Such matters of form do not determine in substance whether the tax merely requires interstate commerce to "pay its way," *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 281 (1977) (internal quotation marks omitted), or discriminates against interstate trade. "The question of constitutional validity is not to be determined by artificial standards. What is required is that state action, whether through one agency or another, or through one enactment or more than one, shall be consistent with the restrictions of the Federal Constitution. There is no demand in that Constitution that the State shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the State's constitutional power." *Gregg Dyeing, supra,* at 480. See also *Maryland*, 451 U. S., at 756; *Halliburton, supra,* at 69.[5] If a State may

---

[5] Of course, this is not to suggest that courts should "plunge . . . into the morass of weighing comparative tax burdens," *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 289 (1987) (internal quotation marks omitted). But as far as the compensatory tax doctrine is concerned, a court that is confined to examining the rates specified in statutes, ordinances, or regulations for taxes assessed on "substantially equivalent event[s]," *Maryland* v. *Louisiana*, 451 U. S. 725, 759 (1981)—even if the

place the provisions perfecting a compensatory tax scheme in two or more statutes passed by the state legislature, there is no logical reason to think that a State's decision to implement its sales/use tax scheme through provisions promulgated at different levels of government within the State makes the system invalid.

## C

That we have declared the tax scheme impermissibly discriminatory in some localities does not in itself dictate the relief that the State must provide. As we noted in *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation*, 496 U. S. 18, 39–40 (1990), a "State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination." We have suggested that the provision of a "meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing" is itself sufficient to satisfy constitutional concerns. *Id.*, at 38, n. 21. Because the parties have not addressed the procedures that were available in Missouri to contest the tax, any effect Missouri's procedures might have on the appropriate remedy in this case is best left for consideration on remand. Even if no such predeprivation procedure existed, the Due Process Clause would demand only that, "to cure the illegality of the tax as originally imposed, the State must ultimately collect a tax for the contested tax period that in no respect impermissibly discriminates against interstate commerce." *Id.*, at 44, n. 27. The methods best adapted to achieving equal treatment in this case, whether partial or complete refunds or other measures, are similarly matters properly left for determination on remand.

---

inquiry requires examination of hundreds of provisions for political units within the State—avoids being drawn into an amorphous inquiry that involves balancing incommensurate burdens imposed on disparate activities throughout the complex structure of a State's tax system.

## III

For the foregoing reasons, the judgment of the Supreme Court of Missouri is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN concurs in the judgment.