BULKMATIC TRANSP. CO.
et al., Petitioners,

v.

DEPARTMENT OF STATE REVENUE,
Respondent.

No. 49T10–9711–TA–00195.

Tax Court of Indiana.

Aug. 2, 1999.

Robert W. Loser II, Patrick M. O'Brien, Steers Sullivan, P.C., Indianapolis, Indiana, Attorneys for Petitioners.

Jeffrey A. Modisett, Attorney General of Indiana, Indianapolis, Indiana, David A. Ar-

thur, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

FISHER, J.

Bulkmatic Transport Co. and 59 other petitioners [hereinafter collectively referred to as petitioners] are commercial trucking companies who use Indiana highways in the course of their business. They challenge the constitutionality of the in Indiana limitation on the proportional use exemption from Indiana's motor carrier fuel tax and motor carrier fuel surcharge tax.[1]

## PROCEDURAL HISTORY

Each petitioner has filed a Department Form MF-6431 Proportional Use Exemption Claim For Refund requesting refunds of motor carrier fuel tax and motor carrier surcharge tax for various tax periods during 1991 to 1995.[2] *See* IND.CODE ANN. §§ 6-6-4.1-4(d), -4.5(d) (West Supp.1998) (amended 1999). The Department did not rule on the petitioners' refund claims, and on November 21, 1997, the petitioners filed this original tax appeal. *See* IND.CODE ANN. § 6-8.1-9-1(a), - 1(c) (West Supp.1998). During the pendency of this original tax appeal, this Court issued its decision in *Bulkmatic II*. In that case, this Court held that the in Indiana limitation of the proportional use exemption violated the Commerce Clause.[3] On September 30, 1998, the petitioners filed a motion for summary judgment asking that the Court once again declare the in Indiana limitation on the proportional use exemption unconstitutional and order the Department to refund the amounts claimed by the petitioners in their refund claims. On February 19, 1999, the Department filed its response. In that response, the Department raised a number of issues that, in the Department's view preclude the granting of summary judgment.

On May 6, 1999, the Court heard oral argument on the petitioners' motion.

## ANALYSIS AND OPINION

### Standard of Review

The Court reviews final determinations of the Department de novo and is bound by neither the evidence nor the issues raised at the administrative level. *See* IND.CODE ANN. § 6-8.1-9-1(d) (West Supp.1998); *ANR Pipeline Co. v. Department of State Revenue,* 672 N.E.2d 91, 93 (Ind.Tax Ct.1996). Summary judgment is only appropriate where there are no genuine issues of material fact and judgment may be entered as a matter of law. *See* IND. T.R. 56(C); *Hyatt Corp. v. Department of State Revenue,* 695 N.E.2d 1051, 1053 (Ind.Tax Ct.1998), *review denied.*

### Discussion

Indiana levies two taxes on motor carriers[4] who operate commercial vehicles in Indiana. These taxes are imposed on the consumption of motor fuel on Indiana highways, *see* IND.CODE ANN. §§ 6-6-4.1-4(a), - 4.5(a) (West Supp.1998); *see also generally Bulkmatic Transp. Co. v. Department of State Revenue,* 648 N.E.2d 1156 (Ind.1995) (*Bulkmatic I*), and are for the benefit of using Indiana's public highways. *See Roehl Transp., Inc. v. Department of State Revenue,* 653 N.E.2d 539, 546 (Ind.Tax Ct.1995). These taxes are comprised of the motor vehicle fuel tax, which is imposed at the same rate ($0.16 per gallon) as the tax paid by the general public as everyday consumers of motor vehicle fuel,[5] and the motor carrier surcharge tax, which is imposed at a rate of $0.11 per gallon. As a result, motor carriers pay $0.27 per gallon of motor fuel consumed on Indiana highways. *See Bulkmatic II,* 691 N.E.2d at 1373 n. 2; *Roehl Transp., Inc.,* 653 N.E.2d at 545 n. 3.

---

1. In *Bulkmatic Transport Co. v. Department of State Revenue,* 691 N.E.2d 1371, 1372 (Ind.Tax Ct.1998) (*Bulkmatic II*), this Court reviewed the history of the proportional use exemption and the in Indiana limitation on that exemption. The Court sees no reason to repeat that review here.

2. Throughout the opinion, unless otherwise indicated, the Court refers to the law as it existed during the relevant tax periods.

3. U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce ... among the several States....").

4. *See* IND.CODE ANN § 6-6-4.1-1(a) (West Supp. 1998) (defining carrier).

5. *See* IND.CODE ANN § 6-6-2.5-28(a) (West Supp. 1998).

The two taxes [hereinafter collectively referred to as the motor carrier fuel tax] are calculated by using a straightforward apportionment formula. First, the motor carrier determines the amount of fuel it consumes in its entire operations, both within and without Indiana. *See Bulkmatic II,* 691 N.E.2d at 1373. This figure is then multiplied by a fraction, the numerator of which is the total number of miles traveled on Indiana highways and the denominator of which is the total number of miles traveled within and without Indiana. *See Roehl Transp.,* 653 N.E.2d at 545. The resulting product, which putatively represents the number of gallons of fuel consumed by a motor carrier on Indiana highways, is then multiplied by the applicable rate of $0.27 to arrive at the motor carrier's motor carrier fuel tax liability. *See Bulkmatic II,* 691 N.E.2d at 1373.

Although all of the fuel consumed in a motor carrier's operations is included in the calculation of the tax, not all of the fuel consumed in a motor carrier's operations is due to highway driving. *See Roehl Transp., Inc.,* 653 N.E.2d at 544. Some commercial vehicles have a single fuel tank that supplies both the vehicle's engine and attached equipment on the vehicle.[6] *See Bulkmatic I,* 648 N.E.2d at 1156. Under the statutory formula, fuel consumed while operating the attached equipment is treated the same as fuel consumed operating the engine, and, consequently, the motor carrier's tax liability will reflect the fuel consumed operating the attached equipment. *See Bulkmatic II,* 691 N.E.2d at 1373 & n. 3. (For the sake of consistency with the terminology used in *Bulkmatic II,* the Court will refer to the attached equipment as power take-off (PTO) equipment.)

To alleviate this result, the Indiana General Assembly exempted the fuel used in operating PTO equipment from the motor carrier fuel tax. *See* IND.CODE ANN. §§ 6–6–4.1–4(d), –4.5(d) (West Supp.1998) (amended 1999). The amount of fuel exempted from the tax is determined not by how much fuel is actually consumed in operating the PTO equipment, but rather by a rule adopted by the Department.[7] *See Bulkmatic II,* 691 N.E.2d at 1373. The rule adopted by the Department exempts a fixed percentage of the fuel consumed. (Thus, the exemption is referred to as the proportional use exemption.) The fixed percentage varies according to the type of vehicle and the type of PTO equipment on the vehicle. *See id.;* IND. ADMIN. CODE tit. 45, r. 13–4–7 (1996). However, the Indiana General Assembly has limited this exemption to the use of PTO equipment in Indiana.[8] As a result, although the fuel consumed in a motor carrier's operation of PTO equipment in all fifty states is considered in the determination of a motor carrier's tax liability, Indiana only exempts fuel consumed by operating this PTO equipment in Indiana.

The practical effect of the in Indiana limitation is to exact a different price for the use of Indiana roads based on where the motor carrier decides to operate its PTO equipment. *See Bulkmatic II,* 691 N.E.2d at 1376. For example, if 10,000 gallons of motor fuel are apportioned to Indiana under the statutory formula, the motor carrier's tax liability will be $2700 before the proportional use exemption. If the motor carrier's fleet only travels through Indiana and never uses PTO equipment in Indiana, then the motor vehicle's tax liability will remain at $2700. If, however, the motor carrier uses PTO equipment in Indiana, that tax liability will be decreased by the proportional use exemp-

---

6. There are various kinds of attached equipment and various uses for such equipment. One such use is to offload cargo. *See Bulkmatic II,* 691 N.E.2d at 1372–73.

7. Under subsections 6–6–4.1–4(d) and –4.5(d), the carrier is required to pay the tax first and then file a refund claim. *See Bulkmatic II,* 691 N.E.2d at 1372 n. 1. Throughout the opinion, the term *exemption is used to describe this process,* and the term also refers to the exemptions provided in both subsections.

8. This year, the General Assembly significantly changed proportional use exemption. *See* Act of May 13, 1999, No. 222, §§ 3–6, 1999 Ind. Legis. Service (West) 891, 892–94. The General Assembly changed the exemption to a credit, eliminated the in Indiana limitation, and capped the total amount of proportional use credits and refunds at $3,500,000 per fiscal year.

tion,[9] thereby lowering the effective motor carrier fuel tax rate. As a result, if a motor carrier uses PTO equipment that motor carrier's tax liability depends on where it uses the PTO equipment. As noted above, in *Bulkmatic II,* this Court recently held that the disparity in tax treatment caused by the in Indiana limitation violated the Commerce Clause because it discriminated against interstate commerce. The Department chose not to appeal that decision. Now, the Department asks the Court to reconsider *Bulkmatic II* in this case.

■ By its terms, the Commerce Clause is only an authorization for Congress to regulate commerce. However, it is settled law that the Commerce Clause, even in the absence of Congressional action, acts as a limitation upon the power of the states. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 571, 117 S.Ct. 1590, 1596, 137 L.Ed.2d 852 (1997). One of these limitations is that a state may not discriminate against interstate commerce. *See West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 192, 114 S.Ct. 2205, 2211, 129 L.Ed.2d 157 (1994). This limitation also acts upon the states' power to tax, and no state, consistent with the Commerce Clause, may impose a tax that discriminates against interstate commerce. *See General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997) ("The negative or dormant implication of the Commerce Clause prohibits state taxation ... that discriminates against ... interstate commerce...."); *Westinghouse Elec. Corp. v. Tully,* 466 U.S. 388, 403, 104 S.Ct. 1856, 1865, 80 L.Ed.2d 388 (1984) (collecting cases).

■ As noted by one commentator, the U.S. Supreme Court has never precisely delineated the scope of the doctrine that bars discriminatory taxation by states. *See* Walter Hellerstein, *Commerce Clause Restraints on State Tax Incentives,* 82 MINN. L.REV. 413, 415 (1997); *see also West Lynn Creamery, Inc.,* 512 U.S. at 210, 114 S.Ct. at 2220 (Scalia, J., concurring) (labelling Supreme Court negative Commerce Clause jurispru-

dence a "quagmire" once one gets past facial discrimination against interstate commerce); *Westinghouse Elec. Corp.,* 466 U.S. at 403, 104 S.Ct. at 1865 (case-by-case analysis of state taxation schemes has not always provided precise guides to the states). However, the basic principle is clear: a state taxation scheme must operate evenhandedly with respect to interstate commerce. *See Fulton Corp. v. Faulkner,* 516 U.S. 325, 331, 116 S.Ct. 848, 856, 133 L.Ed.2d 796 (1996) ("[A] State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.") (quotation omitted); Hellerstein, *supra,* at 415 ("A tax which by its terms or operation imposes greater burdens on out-of-state goods, activities, or enterprises will be struck down as discriminatory under the Commerce Clause."). The in Indiana limitation on the proportional use exemption violates this basic principle and therefore violates the Commerce Clause. This conclusion is confirmed by a detailed review of three Supreme Court Commerce Clause cases.

In *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), the Supreme Court evaluated the constitutionality of Louisiana's "First–Use Tax" on certain uses of natural gas brought into Louisiana. The Supreme Court noted that "[a] state tax must be assessed in light of its actual effect *considered in conjunction with other provisions of the State's tax scheme." Id.* at 756, 101 S.Ct. at 2134 (emphasis added). Accordingly, a court examining a state tax must look not only to the tax, but also to any credits, exemptions or exclusions associated with that tax. *See id.,* 101 S.Ct. at 2134; *see also West Lynn Creamery, Inc.,* 512 U.S. at 211, 114 S.Ct. at 2220 (Scalia, J., concurring) (neutral tax combined with discriminatory credit or exemption violates the Commerce Clause because it is in principle no different from discriminatory taxation of out-of-state economic interests). In the case of Louisiana's "First–Use Tax," due to the various credits and exemptions associated with that tax, in-state consumers of natural gas were

---

9. As stated above, the proportional use exemption varies according to the type of vehicle and the type of attached equipment.

exempted from the burdens of the tax, whereas out-of-state consumers were not. Moreover, the Supreme Court found that one of the credits (Severance Tax Credit) associated with the tax favored those who owned natural gas subject to the tax and engaged in oil, gas, and mineral production in Louisiana. According to the Supreme Court, this was improper because

> the obvious economic effect of this Severance Tax Credit is to encourage natural gas owners involved in the production of [ ] gas [subject to the tax] to invest in mineral exploration and development within Louisiana *rather than to invest in further development of* [gas subject to the tax] *or in production in other States.*

*Id.* at 757, 101 S.Ct. at 2134 (emphasis added).

In *Boston Stock Exchange v. New York Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), the Supreme Court was called upon to determine the constitutionality of a New York stock-transfer tax. The tax at issue was imposed on a securities transaction if any part of that transaction occurred within New York. (Due to the nature of the securities business, transactions related to a sale of securities may take place in New York, while other transactions, such as the actual sale of the securities, may take place outside of New York.) If the taxable transfer involved a sale, the tax was imposed on the selling price per share and the number of shares sold.

In imposing this stock-transfer tax, New York provided incentives for non-residents transferring securities to conduct their sales within New York. New York offered these non-residents a 50% reduction in the tax when the sale was made in New York. New York also limited the total tax liability of any taxpayer (resident or non-resident) to $350 for any single transaction involving a sale in New York. As a result, taxpayers contemplating large-block transactions could reduce their tax liability if they made those sales in New York.

The Supreme Court struck down this stock-transfer tax scheme. New York, the Supreme Court found, did not provide "the evenhanded treatment demanded by the Commerce Clause." *Id.* at 332, 97 S.Ct. at 608. Rather, New York was "using its power to tax an in-state operation as a means of requiring other business operations to be performed in the home State." *Id.* at 336, 97 S.Ct. at 610 (internal quotation marks and alteration omitted). This was wholly incompatible with the policy of free trade between the states embodied in the Commerce Clause.

In 1984, relying heavily on *Maryland v. Louisiana* and *Boston Stock Exchange,* the Supreme Court decided *Westinghouse Electric Corp. v. Tully,* a case with a great deal of factual similarity to the one at bar. *Westinghouse Electric Corp.* arose after Congress enacted Domestic International Sales Corporations (DISC) tax incentives. Under federal tax law, DISCs were exempted from income tax, and their shareholders were only taxable on a portion of that income. New York decided to attribute DISC income to a DISC's parent corporation and apportion that income (along with the parent's non-DISC income) on the basis of a standard apportionment formula (i.e., on the basis of the parent's in-state property, payroll, and receipts versus total property, payroll, and receipts). New York also provided a tax credit on DISC income based on the ratio of the DISC's export business actually conducted in New York to export business conducted in all states. Westinghouse Electric Corp. challenged the constitutionality of the tax credit. It asserted that the credit violated the Commerce Clause because it discriminated against parents of DISCs to the extent that the DISCs made export shipments from outside New York.

The Supreme Court agreed. First, the Supreme Court noted that New York's credit was not insulated from scrutiny simply because the DISC income was fairly apportioned to New York under New York's apportionment formula. In the words of the Supreme Court, "Fairly apportioned and non-discriminatory are not synonymous terms[,]" *id.* at 399, 104 S.Ct. at 1863, and "nothing about the apportionment process releases the State from the constitutional restraints that limit the way in which it exercises its taxing power over the income

within its jurisdiction." *Id.* at 398–99, 104 S.Ct. at 1863. The Court also rejected New York's argument that restricting the credit to those exports made from New York would prevent taxpayers from receiving a credit with respect to DISC income not apportioned to New York. The Court stated, "This argument ignores the fact that the percentage of the DISC's accumulated income that is subject to New York's franchise tax is determined by the parent's business allocation percentage, not by the export ratio."[10] *Id.* at 399, 104 S.Ct. at 1863.

The Court then turned to the actual effect of the tax and the credit together. The Court noted that the export credits "ha[d] the effect of treating differently parent corporations that are similarly situated in all respects except for the percentage of their DISC's shipping activities conducted from New York." *Id.* at 400, 104 S.Ct. at 1863. The scheme had the effect of allowing parents a greater tax credit as the DISC "move[d] a greater percentage of its shipping activities into the State of New York." *Id.*, 104 S.Ct. at 1863. In addition, the scheme decreases the credit as the DISC increases its shipping activities in other states.[11] Thus, parents were penalized if their DISCs conducted out-of-state shipping activities and benefited if they conducted shipping activities within New York.

The obvious result of this scheme was to "foreclose[ ] tax neutral decisions" on the part of taxpayers and " 'create[ ] an advantage' for firms operating in New York by placing 'a discriminatory burden on commerce to its sister States.' " *Id.* at 406, 104 S.Ct. at 1867 (quoting *Boston Stock Exch.,* 429 U.S. at 331, 97 S.Ct. at 608). It was of no moment that the discrimination took the form of a denial of a credit for out-of-state shipping activities rather than a discriminatory tax rate because "the discriminatory economic effect of these two measures would be identical." *Id.* at 404, 104 S.Ct. at 1866; *see also New Energy Co. v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (striking down a tax credit because its effect would be to impose a higher tax on out-of-state goods). As a result, New York could not evade Commerce Clause restrictions on its ability to tax DISC income by using a discriminatory credit rather than a discriminatory tax.

These three Supreme Court decisions expose the constitutional infirmities of the in Indiana limitation on the proportional use exemption. A motor carrier choosing to use PTO equipment outside of Indiana is penalized by Indiana for doing so. This violates the Commerce Clause. Once Indiana decided to bring all gallons consumed in operating

10. In their treatise on state taxation, Jerome R. Hellerstein and Walter Hellerstein elaborate on this observation:

When New York took the step of limiting the credit by reference to the DISC's New York export ratio, it was tying the credit to New York activities in a manner that no longer corresponded evenhandedly to the DISC income being taxed. Rather, the effective New York tax rate on the DISC income being taxed (i.e., the DISC income apportioned to New York by the parent's business allocation percentage) varied directly with the extent of the taxpayer's New York DISC-related activities. The greater the percentage of a DISC's export shipments from New York, the greater the relative credit for taxes paid upon DISC income within New York's tax power, and the lower the effective New York tax rate on such income. The lower the percentage of a DISC's export shipments from New York, the lower the relative credit for taxes paid upon DISC income, and the higher effective New York tax rate on such income. New York thus released its grip on DISC income within its taxing pow-

er only to the extent that DISC-related activities were carried on in the state. It kept its grip firmly upon DISC income within its taxing power to the extent that DISC-related activities were carried on outside the state.
1 Jerome R. Hellerstein & Walter Hellerstein, STATE TAXATION, ¶ 4.13[2][b] (3d ed.1998) (footnote omitted).

11. The Supreme Court also provided hypothetical examples to illustrate the discriminatory effect of the export credit. *See id.* at 400–02 n. 9, 104 S.Ct. at 1863–65 n. 9. Of course, when it considers the constitutionality of a state taxation scheme, the Supreme Court is not limited to hypothetical examples. Recently, the Supreme Court noted the actual effect of a discriminatory state taxation scheme. *See South Cent. Bell. Co. v. Alabama,* 526 U.S. 160, ——, 119 S.Ct. 1180, 1186, 143 L.Ed.2d 258 (1999) ("This discrimination is borne out in practice, as the record, undisputed here, shows that the average domestic corporation pays only one-fifth the franchise tax it would pay if it were treated as a foreign corporation.").

PTO equipment into the apportionment formula, Indiana was required to apply that formula consistently to all gallons consumed in operating PTO equipment. *See Maryland v. Louisiana,* 451 U.S. at 758–59, 101 S.Ct. at 2135–36 (gas leaving state cannot be treated differently from gas remaining in state). In other words, where the gallons are consumed should be irrelevant. However, Indiana exempts only those gallons consumed in Indiana, and it is essentially doing what New York attempted to do with its discriminatory export credit. The in Indiana limitation distorts a neutral apportionment formula and has the unmistakable effect of discriminating against out-of-state PTO use:

By engaging in this discrimination, Indiana is exercising its power to tax motor fuel to coerce the direction of additional economic activity to Indiana. *See Boston Stock Exch.,* 429 U.S. at 336, 97 S.Ct. at 610; *see also Bulkmatic II,* 691 N.E.2d at 1377 (quoting Hellerstein, *supra,* at 426–27). Because motor carriers are subjected to a higher tax burden if they use their PTO equipment outside of Indiana, they will be more likely to use that equipment in Indiana. Thus, motor carriers are unable to make a tax-neutral decision about where they will use their PTO equipment. *See Boston Stock Exch.,* 429 U.S. at 331, 97 S.Ct. at 607–08.

In addition, the in Indiana limitation on the proportional use exemption runs afoul of the Commerce Clause's prohibition on discrimination against out-of-state economic interests. *See Camps Newfound,* 520 U.S. at 579–80, 117 S.Ct. at 1598. As noted in *Bulkmatic II,* PTO equipment is often used in loading and unloading cargo. *See Bulkmatic II,* 691 N.E.2d at 1376–77; *see also Camps Newfound,* 520 U.S. at 576, 117 S.Ct. at 1598 (effect of discriminatory property tax exemption was to dissuade camps from serving out-

of-state clientele). By reducing the transaction costs of Indiana onloads and offloads of cargo relative to out-of-state onloads and offloads of cargo, the in Indiana exemption makes the petitioners more likely to make onloads and offloads of cargo for their Indiana customers. *See Bulkmatic II,* 691 N.E.2d at 1376–77. The Commerce Clause forbids Indiana from using its taxing power in such a manner. *See Westinghouse Elec. Corp.,* 466 U.S. at 406, 104 S.Ct. at 1867.

▄▄▄ The Department's arguments to the contrary do not alter this conclusion. Before turning to the merits of the Department's arguments, the Court notes that the Department has not favored the Court with any citation to Supreme Court Commerce Clause case law in those portions of its brief dealing with the constitutionality of the in Indiana limitation. This would be troubling enough if the Court had not issued its decision in *Bulkmatic II.* However, because *Bulkmatic II* specifically discussed many recent U.S. Supreme Court decisions dealing with the Commerce Clause and state taxation, the failure of the Department to discuss these cases is inexcusable.[12] *See County Line Towing, Inc. v. Cincinnati Ins. Co.,* 714 N.E.2d 285, 290–291 (Ind.Ct.App.1999) (briefs should be of material assistance to court) (citing *Young v. Butts,* 685 N.E.2d 147, 151 (Ind.Ct.App.1997)).

The Department's main argument in support of the constitutionality of the in Indiana limitation has some surface appeal. In the Department's view, one must focus on the "lodestar." The "lodestar" is the total number of gallons of motor fuel apportioned to Indiana under the statutory apportionment formula. According to the Department, some of these gallons, because they are subject to Indiana's unquestioned power to tax,

---

12. The Department is reminded that, unless the law specifically requires otherwise, state agencies, when they appear in state courts, are to be treated like any other litigant. *See, e.g., Byrd v. State,* 592 N.E.2d 690, 691 (Ind.1992) (citing *State v. Robbins,* 221 Ind. 125, 46 N.E.2d 691 (1943)). As a result, briefs submitted by the Department that are clearly inadequate will not be excused simply because the Department defends the public fisc. Otherwise, the Court would be abandoning the neutral stance it must

take when it resolves disputes between taxing authorities and taxpayers. In this case, however, the petitioners have not complained about the failure of the Department to cite, let alone discuss, the relevant Supreme Court Commerce Clause case law in its brief. Consequently, the Court will address the Department's arguments on the merits. It is hoped that the Department will not repeat its deficient briefing in future cases.

*see Roehl Transp., Inc.*, 653 N.E.2d at 545–46, may be constitutionally exempted from tax as well. In addition, as the Department points out, gallons that are not apportioned to Indiana are not subject to Indiana motor carrier fuel tax. As a result, the Department argues, Indiana does not have to exempt gallons that were never apportioned to Indiana in the first place.

As for the Department's contention that Indiana may constitutionally exempt any gallons apportioned to Indiana it chooses, a similar argument was decisively rejected in *Westinghouse Electric Corp.* In that case, New York argued that "the DISC tax credit merely forgives a portion of the tax that New York has jurisdiction to levy," *Westinghouse Elec. Corp.*, 466 U.S. at 398, 104 S.Ct. at 1862, and therefore was constitutional. The Court stated,

> New York's apportionment procedure determines what portion of a business' income is within the jurisdiction of New York. Nothing about the apportionment process releases the State from the constitutional restraints that limit the way in which it exercises its taxing power within its jurisdiction.

*Id.* at 398–99, 104 S.Ct. at 1863. Consequently, the mere fact that Indiana is refunding tax that it could have kept does not make the in Indiana limitation constitutional.

As for the Department's contention that Indiana does not have to pay refunds for gallons never subject to taxation, a similar argument was also decisively rejected in *Westinghouse Electric Corp.* In that case, New York argued that limiting its DISC credit to exports originating from New York ensured that New York was not exempting income not taxable by New York in the first place. The Court saw through that argument: "This argument ignores the fact that the percentage of DISC accumulated income that is subject to New York's franchise tax is determined by the parent's business allocation percentage, not by the export ratio." *Id.* at 399, 104 S.Ct. at 1863; *see also* Hellerstein, *supra*, at 444. Similarly, gallons of motor fuel are apportioned to Indiana on the basis of the percentage of miles traveled in Indiana, *not on the basis of where a motor carrier uses its PTO equipment.*

Thus, the in Indiana limitation distorts the apportionable base and has the effect of treating motor carriers differently solely on the basis of where they choose to use their PTO equipment. The Department's contention that the in Indiana limitation merely prevents refunds of taxes that have not been paid only serves to obfuscate this reality. The bottom line is that all other things being equal (i.e., total motor fuel consumption and percentage of miles traveled within Indiana), a motor carrier will pay more tax to Indiana the more it uses its PTO equipment elsewhere.[13] Any argument that does not ac-

---

13. At oral argument, counsel for the Department stated that there was no discrimination against interstate commerce because "[e]verybody is being treated exactly the same." (Oral Arg. Tr. at 20). This statement is nothing short of preposterous. That the exemption is equally available to all those who use PTO equipment in Indiana has nothing to do with whether the in Indiana limitation is nondiscriminatory. The export credit at issue in *Westinghouse Electric Corp.* was equally available to all those who exported from New York, yet it discriminated against interstate commerce. The issue in this case is whether Indiana has the right to condition an exemption from the motor carrier fuel tax on the basis of where the motor carrier chooses to use PTO equipment, not whether all motor carriers who use PTO equipment out-of-state are treated the same as other motor carriers who use PTO equipment out-of-state. The point, of course, is that if Indiana must treat out-of-state PTO equipment use exactly the same as Indiana PTO equipment use, it is no answer to say that Indiana

treats all Indiana PTO equipment use in the exact same manner and that Indiana treats all out-of-state PTO equipment use in the exact same manner.

After making this statement, counsel for the Department offered an example about an older truck that consumes more motor fuel per mile and will accordingly pay more tax. Apparently, counsel was attempting to suggest that the difference between the tax a motor carrier pays when the motor carrier uses PTO equipment in Indiana and when that motor carrier uses PTO equipment out-of-state can be chalked up to "the [same] fact[s] of life" that an operator of an older truck must endure. (Oral Arg. Tr. at 22). The Court rejects this suggestion. That it is permissible to have the incidence of this tax fall more heavily on some trucks due to their lower gas mileage has nothing to do with whether conditioning the amount of a motor carrier's tax on the state in which the motor carrier chooses to use its PTO equipment is constitutional. It is

knowledge this indisputable fact is disingenuous.

Moreover, the Department's contention that the in Indiana limitation merely prevents refunds of taxes that have never been paid is also factually erroneous. When a motor carrier consumes motor fuel in operating PTO equipment, Indiana taxes a percentage of that motor fuel based on the percentage of miles traveled in Indiana. This is true whether the fuel is consumed inside or outside Indiana. This, coupled with the fact that the apportionment percentage *does not vary according to where the motor carrier uses its PTO equipment,* makes the Department's contention that the fuel was never taxed in the first place simply untrue.

In essence, the Department's argument is an attempt to point to the legitimacy of the apportionment formula [14] to mask the unconstitutionality of the in Indiana limitation. But the Court is not so easily hoodwinked. Indiana certainly has a right to include motor fuel consumed in out-of-state PTO use in its apportionment formula; it also has the right to use the percentage of miles traveled in Indiana in that formula. However, in doing so, it may not discriminate between gallons consumed in out-of-state PTO use and gallons consumed in in-state PTO use because the apportionment formula does not take into account the percentage of in-state PTO use. *See Westinghouse Elec. Corp.,* 466 U.S. at 399, 104 S.Ct. at 1863 (" 'Fairly apportioned' and 'nondiscriminatory' are not synonymous terms.") However, as a result of the in Indiana limitation, in-state gallons are treated better than out-of-state gallons. This is not the "substantially evenhanded treatment demanded by the Commerce Clause." *See Boston Stock Exch.,* 429 U.S. at 332, 97 S.Ct. at 608.

The Department's final argument is that, because the motor fuel has already been apportioned to Indiana, the proportional use exemption does not involve interstate commerce, and, therefore, the in Indiana limitation cannot discriminate against interstate commerce. This argument is completely without merit. The consumption of fuel in the transportation and loading and unloading of cargo is in interstate commerce, *see Case of the State Freight Tax,* 82 U.S. (15 Wall.) 232, 275–76, 21 L.Ed. 146 (1872), and the motor carrier fuel taxing scheme affects this commerce by increasing its costs.[15] Because this taxing scheme affects interstate commerce, it is subject to Commerce Clause scrutiny. *See Commonwealth Edison Co.,* 453 U.S. at 614–17, 101 S.Ct. at 2952–53. As a result, the in Indiana limitation cannot be saved on this basis.

Now that the Court has resolved the question of the constitutionality of the in Indiana limitation, the Court turns to the Department's other arguments in response to the petitioners' summary judgment motion. The Department's main contention is that, even if the in Indiana limitation is unconstitutional, the Court may not order refunds because there is no statutory authorization to do so. Accordingly, the Department maintains that the only possible remedy for the petitioners is for the Court to declare the entire proportional use exemption unconstitutional and hold the exemption void ab initio. As a result, no motor carrier would be entitled to the proportional use exemption, and, thus, any discrimination would be removed.

■ Of course, as a prospective matter, the Department is certainly correct. The Commerce Clause only requires that the states not discriminate against interstate commerce. *See Associated Indus. v. Lohman,* 511 U.S. 641, 656, 114 S.Ct. 1815, 1825, 128 L.Ed.2d 639 (1994). As a result, when a state tax exemption has been declared unconstitutional under the Commerce Clause, the state may either apply the exemption in a non-discriminatory manner or remove the exemption altogether. In this case, the Indiana General Assembly has already made that

---

this "fact of life" that the Department has consistently ignored throughout its brief.

**14.** This Court has previously upheld the constitutional legitimacy of the statutory apportionment formula. *See Roehl Transp., Inc.,* 653 N.E.2d at 546.

**15.** This, of course, is not problematic. "Even interstate business must pay its way." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 616, 101 S.Ct. 2946, 2953, 69 L.Ed.2d 884 (1981) (alteration and internal quotations omitted).

choice by substantially amending the proportional use exemption.

■ However, that only addresses one part of the problem. The question remains about what remedy is due the petitioners who have been taxed in an unconstitutional manner. The Department contends that they should get nothing. Due process requires otherwise.[16] *See generally Reich v. Collins*, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994); *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). In this case, by applying for a refund under subsections 6–6–4.1–4(d), –4.5(d), the petitioners have pursued a "clear and certain" postdeprivation remedy (i.e., a remedy for those who chose to pay the tax and litigate later). *Reich*, 513 U.S. at 113, 115 S.Ct at 551; *Newsweek, Inc. v. Florida Dep't of Revenue*, 522 U.S. 442, 118 S.Ct. 904, 139 L.Ed.2d 888 (1998). As a result, they are entitled to "meaningful backward-looking relief." [17] *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 101, 113 S.Ct. 2510, 2519, 125 L.Ed.2d 74 (1993).

Of course, "meaningful backward looking relief" does not necessarily mean refunds. It means that Indiana must put the petitioners in the same position as they would have been absent the discrimination vis-à-vis those who received favorable treatment. *See Associated Indus.*, 511 U.S. at 656, 114 S.Ct. at 1825 (quoting *McKesson Corp.*, 496 U.S. at 44 n. 27, 110 S.Ct. at 2254 n. 27). Simply declaring the proportional use exemption void ab initio does not do so. Accordingly, the Department's "remedy" is plainly inadequate.

In its brief, the Department unsuccessfully attempts to distinguish *Reich* and *Newsweek, Inc.* by pointing out that those cases involved

an unconstitutional tax, rather than an unconstitutional refund. This case involves (as described above) a refund scheme whereby taxpayers first pay the motor carrier fuel tax and then apply for a refund. Therefore, according to the Department, the authority to tax is not at issue, as it was in *Reich* and *Newsweek, Inc.* Rather, it is the authority to refund a portion of that tax that is at issue. Consequently, "it is the refund and not the tax itself that must be thrown out to set the constitutional balance correct." (Dep't Br. at 12).

This attempt to elevate nomenclature over the due process rights of the petitioners is wholly unmeritorious. First of all, the commands of due process are not made any less by the fact that Indiana has chosen to collect a tax and then allow a refund on a discriminatory basis instead of levying a tax in a discriminatory manner when the practical economic effect of these two methods is indistinguishable. *Cf. Westinghouse Elec. Corp.*, 466 U.S. at 405, 104 S.Ct. at 1866 ("formal distinctions that lack economic substance" are irrelevant in analyzing state tax under Commerce Clause). Second, the Department ignores the fact that taxpayers who qualified for the unconstitutional refund incurred a lesser tax burden than did the petitioners. To adhere to the Department's view would leave this unequal treatment in place and would fly in the face of repeated pronouncements of the Supreme Court requiring "meaningful backward looking relief." The unequal treatment of the petitioners for the tax periods at issue must be rectified in order "to set the constitutional balance correct." [18] *See Assoc. Indus.*, 511 U.S. at 656, 114 S.Ct. at 1825.

Apart from its arguments on the constitutionality of the in Indiana limitation and the

---

16. The Department cites a number of Indiana cases discussing what remedies are available when a court declares an Indiana statute unconstitutional. It goes without saying that these cases, to the extent that they are inconsistent with the Fourteenth Amendment Due Process Clause, must give way. *See* IND.CODE ANN. § 1–1–2–1 (1981).

17. States are, of course, free to maintain an exclusively predeprivation (i.e., litigate first, pay later) remedial scheme. *See Reich*, 513 U.S. at 110–11, 115 S.Ct. at 550.

18. In all likelihood, the only way for this to occur is that the Department provide refunds to the petitioners. However, the Court will withhold judgment on this issue so as to allow the Department the opportunity to determine whether it is possible to provide the petitioners an adequate remedy without receiving refunds. If the Department determines that it is possible to do so, the Court will consider that possibility.

remedies available to the petitioners, the Department opposes summary judgment on other grounds. However, at oral argument, the Department suggested the possibility of the Court granting partial summary judgment on the constitutionality of the in Indiana limitation. This would allow the Department to exercise any appeals that it may wish to take on the constitutionality of the in Indiana limitation without having to litigate the other issues first.[19] The Court finds this suggestion well-taken.

Consequently, the Court now GRANTS partial summary judgment on behalf of the petitioners on the issue of the constitutionality of the in Indiana limitation on the proportional use exemption. Specifically, the Court holds that the in Indiana limitation on the proportional use exemption violates the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3.

**19.** In its brief, the Department also pointed out that a few of the petitioners' refund claims are time-barred. At oral argument, the counsel for the petitioner conceded that there were "approximately four or five carriers that filed beyond the statute." (Oral Arg. Tr. at 6). Accordingly, the Court will dismiss all untimely claims by separate order.