**HI–WAY DISPATCH, INC., Petitioner,**

**v.**

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–9606–TA–63.

Tax Court of Indiana.

Aug. 29, 2001.

Norman R. Garvin, Lynne D. Lidke, Scopelitis, Garvin, Light & Hanson, Indianapolis, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Joel Schiff, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Petitioner Hi–Way Dispatch, Inc. (Hi–Way) challenges the final determination of the Indiana Department of State Revenue (Department) denying Hi–Way's protest of motor carrier fuel tax assessed against Hi–Way for the tax years 1992, 1993, and 1994. In their cross-motions for summary judgment, the parties raise various issues, which the Court restates as:

I. Whether the Department properly included within Hi–Way's total fuel consumed those gallons of fuel consumed by Hi–Way's vehicles during "idle time;"[1]

II. Whether genuine issues of material fact exist with respect to the affirmative defenses of equitable estoppel and laches raised by Hi–Way, which thereby preclude summary judgment on the issue of "idle time" fuel consumption;[2]

III. Whether Hi–Way was entitled to the tax-paid credit for fuel purchased in Indiana but consumed out-of-state in jurisdictions that were not members of the International Fuel Tax Agreement (IFTA), where Hi–Way failed to provide evidence to the Department that it had paid a gasoline, special fuel, or road tax with respect to the fuel consumed to the non-IFTA member jurisdictions.

A. Whether INDIANA CODE § 6–6–4.1–6 conflicts with the provisions of IFTA and thus cannot be used to deny Hi–Way the tax-paid credit for fuel con-

---

1. The Department argues that it is entitled to summary judgment in its favor as a matter of law on this issue.

2. Hi–Way asserts these affirmative defenses in response to the Department's motion for summary judgment on the "idle time" issue.

sumed in non-IFTA member jurisdictions;[3] and

B. Whether INDIANA CODE § 6–6–4.1–6 discriminates against interstate commerce and is therefore unconstitutional.[4]

For the reasons stated below, the Court DENIES Department's motion for summary judgment solely on the basis of laches and DENIES the taxpayers' partial motion for summary judgment.

## FACTS AND PROCEDURAL HISTORY

The following facts are undisputed. Hi–Way is a for-hire authorized motor carrier. Its primary business facilities are located in Marion, Indiana. Hi–Way operates commercial motor vehicles within and through Indiana.

The Department conducted an audit of Hi–Way regarding Hi–Way's liability for fuel taxes collected under IFTA for the calendar years 1992, 1993, and 1994. In its audit summary, dated October 11, 1995, the Department gave the following explanations for adjusting Hi–Way's fuel tax liability: (1) the Department added back into Hi–Way's total fuel figures those gallons deducted by Hi–Way for "idle time" and (2) Hi–Way could not receive Indiana's tax-paid credit for gallons consumed in but not reported to non-IFTA jurisdictions ("excess credit gallons"). (Stipulation, Ex. A at 5.) On November 21, 1995, the Department issued a proposed assessment against Hi–Way for $83,901.35 in fuel taxes, penalty, and interest.

Hi–Way protested the proposed assessment, and the Department conducted a hearing on the protest on February 15, 1996. On April 15, 1996, the Department issued a letter of finding. The letter of finding granted Hi–Way's protest of the proposed ten percent penalty but denied the protest in all other respects. Thereafter, the Department requested that Hi–Way pay a total of $80,354.30 in taxes and interest. On April 26, 1996, Hi–Way requested a rehearing of its protest. By a letter dated May 23, 1996, the Department again denied Hi–Way's protest.

Hi–Way filed this original tax appeal on June 13, 1996. On March 7, 1997, the Department filed a motion for summary judgment. On this same date, Hi–Way filed a motion for partial summary judgment. The Court conducted a hearing on these cross-motions on May 30, 1997. The Court then took the matter under advisement.

## ANALYSIS AND OPINION

### Standard of Review

Summary judgment is appropriate only when no genuine issues of material fact exist and a party is entitled to judgment as a matter of law. IND. TRIAL R. 56(C); *Roehl Transp. v. Indiana Dep't of State Revenue*, 653 N.E.2d 539, 541 (Ind. Tax Ct.1995). Cross motions for summary judgment do not alter this standard. *Id.*

### Discussion

The Court first reviews the relevant statutes and provisions from IFTA prior to discussing the issues in this case.

*Indiana's "Road" & "Pump" Taxes*

#### A. Road Tax

■ The motor carrier fuel tax is "imposed on the consumption of motor fuel by a carrier in its operations on highways in

---

3. Both Hi–Way and the Department contend that they are entitled to summary judgment in their favor as a matter of law on this issue.

4. Hi–Way posits that it is entitled to summary judgment as a matter of law in its favor on this issue.

Indiana."[5] IND.CODE § 6–6–4.1–4(a). *See also* IND. ADMIN. CODE tit. 45, r. 13–4–1 to –7 (2001) (addressing imposition and calculation of motor carrier fuel tax). The purpose of the motor carrier fuel tax is "to charge motor carriers for the use of the public roads in Indiana." *Area Interstate Trucking, Inc. v. Indiana Dep't of Revenue*, 605 N.E.2d 272, 277 (Ind. Tax Ct.1992), *cert. denied*, 510 U.S. 864, 114 S.Ct. 183, 126 L.Ed.2d 142 (1993). INDIANA CODE § 6–6–4.1–4(a) states that the rate for the motor fuel tax is the "same rate per gallon as the rate per gallon at which special fuel is taxed," which is sixteen cents per gallon. *See* IND.CODE § 6–6–2.5–28(a). For the purpose of this opinion, the motor carrier fuel tax will be called the "road tax." In addition to the road tax, INDIANA CODE § 6–6–4.1–4.5(a) imposes an eleven-cent per gallon surcharge tax on motor fuel consumed by carriers operating on Indiana's highways. Thus, combining the road tax with the surcharge tax, carriers effectively pay twenty-seven cents per gallon on motor fuel consumed in their operations on Indiana's highways.

The formula for calculating the amount of fuel consumed on Indiana's highways is as follows:

$$\text{Total amount of Motor Fuel Consumed in Carrier's Entire Operations Within and Without Indiana} \times \frac{\text{Total Amount of Miles Traveled on Highways In Indiana}}{\text{Total Number of Miles Traveled Within and Without Indiana}}$$

IND.CODE § 6–6–4.1–4(b). *See also Roehl Transp.*, 653 N.E.2d at 545 (citing *Area Interstate Trucking*, 605 N.E.2d at 276). A carrier's tax liability is then calculated by multiplying the tax rate (i.e., twenty-seven cents per gallon) by the amount of fuel consumed by the carrier in its operations on Indiana highways. IND.CODE § 6–6–4.1–4(c). However, the gallons for which the carrier has paid the gasoline or special fuel taxes (i.e., the "pump taxes") imposed under INDIANA CODE §§ 6–6–1.1 or 6–6–2.5, *see infra*, are not included within this calculation. *Id. See also Area Interstate Trucking*, 605 N.E.2d at 277 n. 9 (noting that "motor fuel upon which pump taxes are paid is not included in amount of fuel subject to the tax").

Carriers are obligated to pay the road tax and surcharge tax quarterly. IND. CODE §§ 6–6–4.1–4(a) & 4.5(a). Moreover, they must maintain certain books and records with respect to the motor fuel they purchase and consume. IND.CODE § 6–8.1–5–4. INDIANA CODE § 6–6–4.1–20 subjects carriers to penalties if they do not properly maintain the books and records required by INDIANA CODE § 6–8.1–5.

### B. Pump Taxes

The term "pump taxes" refers to the gasoline and special fuel taxes imposed by INDIANA CODE §§ 6–6–1.1–201 and 6–6–2.5–28 respectively. Gasoline includes, among other things, "all products commonly or commercially known or sold as gasoline...." INDIANA CODE § 6–6–1.1–103(g)(1). INDIANA CODE § 6–6–1.1–201 provides that a "license tax of fifteen cents ($0.15) per gallon is imposed on the use of all gasoline used in Indiana, except as oth-

---

5. A "carrier" is "a person who operates or causes to be operated a commercial motor vehicle on any highway in Indiana." IND. CODE § 6–6–4.1–1(a). Per INDIANA CODE § 6–6–4.1–1(b), a "commercial motor vehicle" subject to the fuel tax is any vehicle listed in INDIANA CODE § 6–6–4.1–2(a) and not excluded by INDIANA CODE § 6–6–4.1–2(b).

erwise provided by [IND.CODE § 6–6–1.1]." Distributors of gasoline initially pay the tax, which is then passed along to the purchaser. IND.CODE § 6–6–1.1–201.

Special fuel is "all combustible gases and liquids that are: (1) suitable for the generation of power in an internal combustion engine or motor; or (2) used exclusively for heating, industrial, or farm purposes other than for the operation of a motor vehicle." IND.CODE § 6–6–2.5–22. INDIANA CODE § 6–6–2.5–28(a) imposes a "license tax of sixteen cents ($0.16) per gallon ... on all special fuel sold or used in producing or generating power for propelling motor vehicles...." IND.CODE § 6–6–2.5–28(a). The tax is imposed at the time the special fuel enters Indiana and is collected and remitted to the state by the supplier who receives it; the supplier who sells the special fuel must then collect the tax from the purchaser of the fuel. IND.CODE §§ 6–6–2.5–28 & –35.

### C. Credit

■ The road tax is the "functional compliment to the pump taxes." *Area Interstate Trucking*, 605 N.E.2d at 277. Through the road tax, "motor carriers are prevented from purchasing fuel outside Indiana and then operating tax-free on the state's roads." *Id.* Thus, regardless of where carriers purchase fuel, they are charged for their use of Indiana's roads. *Id.*

The connection between the road and pump taxes is further evidenced by the credit permitted by INDIANA CODE § 6–6–4.1–6(a). This section provides in part:

A carrier is entitled to a credit against the [road tax] if the carrier, or a lessor operating under the carrier's annual permit has:

(1) paid the [gasoline or special fuel] tax ... on motor fuel purchased in Indiana;

(2) consumed the motor fuel outside Indiana; and

(3) paid a gasoline, special fuel, or road tax with respect to the fuel in one (1) or more other states or jurisdictions.

The amount of this tax-paid fuel credit is equal to the amount of the pump tax paid. IND.CODE § 6–6–4.1–6(b). To qualify for the credit, the carrier "shall submit any evidence required by the department of [the carrier's] payment of the [gasoline or special fuel tax]." IND.CODE § 6–6–4.1–6(c).

As noted *supra*, the road tax calculation formula excludes from its "amount of motor fuel consumed" total those gallons for which a carrier has already paid either of the pump taxes. IND.CODE § 6–6–4.1–4(c). Because these gallons are never part of the formula, they are never taxed. Thus, carriers who pay a pump tax and then consume the fuel purchased on Indiana's highways pay either the road tax or the pump tax on those gallons, but not both.

■ The tax-paid fuel credit permits carriers who purchase fuel within Indiana but consume the fuel out-of-state to receive the same benefit. In general, a credit is "an allowance against the tax itself." *Graybar Elec. Co. v. State Bd. of Tax Comm'rs*, 723 N.E.2d 491, 495 (Ind. Tax Ct.2000) (quoting WEST'S TAX LAW DICTIONARY 193 (1995)). The tax-paid fuel credit is an allowance against a carrier's Indiana road tax liability.[6] It lowers a carrier's road tax liability where the taxpayer can show, via the evidence required by the Department, that it has paid the pump tax. Without the credit, a taxpayer who purchases fuel within Indiana (and pays a pump tax on the fuel) and then consumes

---

6. The credit for the pump tax is applied to a carrier's road tax liability, even though the road tax calculation formula excludes fuel consumed by a carrier on out-of-state highways.

it out-of-state would be subjected to Indiana's pump tax *and* to another jurisdiction's gasoline, special fuel, or road tax. The credit prevents this double taxation; a carrier essentially pays either Indiana's pump tax or another state's road tax, but not both.

Taxpayers purchasing fuel within Indiana are basically treated the same with respect to their fuel tax liability regardless of whether they consume the fuel within or without Indiana. The complimentary nature of the road and pump taxes ensures this result. The road tax is designed to prevent a carrier from having a "free ride" on Indiana's highways by purchasing fuel tax out-of-state and then consuming the fuel in state. In comparison, the tax-paid fuel credit prevents the double taxation of carriers choosing to purchase fuel in Indiana (and thereby pay a pump tax) and then consume the fuel outside of the state. The road and pump taxes work together to permit taxation of carriers consuming fuel on Indiana's highways without punishing carriers for consuming fuel beyond the state's borders. In short, they are two means to the same end.

## IFTA

As recently observed by the Indiana Court of Appeals, IFTA is a multi-jurisdictional agreement that is intended to "encourage cooperation in the administration and collection of motor fuel use tax."[7] *Owner–Operator Indep. Ass'n v. Department of Revenue,* 725 N.E.2d 891, 892 (Ind.Ct.App.2000), *trans. denied; see also Roehl Trans., Inc. v. Wisconsin Div. of Hr'gs and Appeals,* 213 Wis.2d 452, 570 N.W.2d 864, 867 (Ct.App.1997) (noting that IFTA "is designed to facilitate the collection of state fuel taxes from interstate motor carriers"). This statement mirrors Article I(C) of IFTA, which provides "[i]t is the purpose of [IFTA] to enable participating jurisdictions to act cooperatively and provide mutual assistance in the administration and collection of motor fuels use taxes." IFTA Article I(C). Additionally, IFTA Article I(B) states "[i]t is the purpose of [IFTA] to promote and encourage the fullest and most efficient possible use of the highway system by making uniform the administration of motor fuels use taxation laws with respect to motor vehicles operated in multiple member jurisdictions." IFTA Article I(B). IFTA enables carriers to file a consolidated tax return in a carrier's "base jurisdiction;" the base jurisdiction, upon collection of the tax, distributes the revenue to those other jurisdictions in which the carrier operates.[8] *Owner–Operator Indep. Ass'n,* 725 N.E.2d at 892.

7. For general information on IFTA, including access to the agreement itself and the IFTA Manual, one may visit the web site of the International Fuel Tax Association, Inc., at http://www.iftach.org/ (last visited Aug. 29, 2001). This Association is "responsible for managing the administration of [IFTA]." IFTA Article XIX(A).

8. The concept of a base jurisdiction is an important aspect of IFTA. "Base jurisdiction" is defined as the member jurisdiction where (1) "qualified motor vehicles are based for vehicle registration purposes," (2) the "operational control and operational records of the licensee's qualified motor vehicles are maintained or can be made available," and (3) where "some travel is accrued by qualified motor vehicles within the fleet." IFTA Article II(B). Base jurisdictions are intended to provide a central licensing and administrative entity for carriers; for individual carriers, the base jurisdiction serves as the "administrator of [IFTA] and execute[s] all its provisions with respect to" the carrier. IFTA Article I(D). As one author explains, under IFTA the "carrier registers with, and reports to, a single [jurisdiction] (the base [jurisdiction]) which, in turn, is responsible for distributing the [tax] proceeds among all other states in which the carrier has activity. The base [jurisdiction] also audits the carrier and provides the other

Indiana became a member jurisdiction of IFTA in 1991, as authorized by INDIANA CODE § 6–8.1–3–14(a) & (b). The Department is permitted to adopt rules to carry out and enforce IFTA.[9] IND.CODE § 6–8.1–3–14(c). Further, INDIANA CODE § 6–8.1–3–14(d) provides that "if the provisions set forth in [IFTA] are different from provisions prescribed by an Indiana Statute, then the [IFTA] provisions prevail." IND. CODE § 6–8.1–3–14(d). During the tax years in question, not all states were member jurisdictions of IFTA.[10]

Under IFTA, the "taxable event is the consumption of motor fuels used in the propulsion of qualified motor vehicles." IFTA Article III(A). However, IFTA excludes "fuel consumed that is exempt from taxation by a jurisdiction." *Id.* Further, IFTA provides that "[a]ll motor fuel acquired that is normally subject to consumption tax is taxable unless proof to the contrary is provided by the licensee." IFTA Article III(C).

IFTA permits member jurisdictions to tax the retail sale of fuel "delivered into the fuel tank that propels the motor vehi-cle" and allows member jurisdictions to "require tax payments on fuel delivered into bulk storage or withdrawn from bulk storage." IFTA Articles VII(A) & (D). These purchases are referred to as "tax-paid purchases." IFTA Article VII(D). Per Article XIII(A), "[a] licensee shall receive full credit or refund for tax-paid fuel used outside the jurisdiction where the fuel was purchased." IFTA Article XIII(A). To obtain credit for these tax-paid purchases, a carrier must retain a receipt or credit card receipt as evidence that the tax was paid directly to the applicable jurisdiction or at the pump.[11] IFTA Article VII(B). However, "[n]o member jurisdiction shall require evidence of such purchases beyond what is specified in the IFTA Procedures Manual." *Id.*

IFTA provides for the adoption of a Procedures Manual to help administer its requirements. *See* IFTA Article XVII(E) ("Adopted procedures shall become part of [IFTA] and shall be placed in writing in the IFTA Procedures Manual."). The IFTA Manual reiterates the need for evi-

---

states with all other necessary information." *State and Local Taxation of Electronic Commerce: Reflections on the Emerging Issues,* 52 U. MIAMI L.REV. 691, 717 n. 92 (1998). *See generally* IFTA Articles IX "Reporting" (providing that licensees shall file quarterly reports with base jurisdiction and shall pay all taxes due to all member jurisdictions with one check, which is to be made payable to the base jurisdiction); X "Base Jurisdiction Accounting" (stating that the base jurisdiction shall maintain the records of licensees located therein and that each jurisdiction "shall forward all funds received to the appropriate jurisdictions once each month"); and XI "Auditing" (requiring base jurisdictions to "audit its licensees on behalf of all member jurisdictions").

9. As of 2000, Indiana had 6119 IFTA accounts and completed 213 audits of these accounts. INDIANA JURISDICTION ANNUAL REPORT FOR 2000.

10. In 1994, federal legislation was passed mandating that, after September 30, 1996, all states (excluding Alaska and Hawaii) "may establish, maintain, or enforce a law or regulation that has a fuel use tax reporting requirement (including any tax reporting form) only if the requirement conforms with [IFTA]." 49 U.S.C. § 31705 (2000). *See also id.,* § 31701(6) (defining "State" as the "48 contiguous States and the District of Columbia"). In addition, the eleven provinces of Canada are member jurisdictions of IFTA. *See* IFTA TEXAS GUIDEBOOK (Pub.96–336) (June 1999).

11. The receipt "must identify the motor vehicle into which the motor fuel was placed." IFTA Article VII(C). For fuels withdrawn from bulk storage, the carrier's records "must identify the quantity of fuel taken from the licensee's own bulk storage and placed in its qualified motor vehicles." IFTA Article VII(D).

dence that fuel tax has been paid in order for a carrier to receive credit for a tax-paid purchase. IFTA Manual II(A). It lists the minimum requirements that a receipt or invoice must be included to be deemed "acceptable." IFTA Manual II(B). The Manual also states that each member jurisdiction "will allow full credit for tax[-]paid purchases." IFTA Manual V(A)(6).

### Issues

### I. "Idle Time" Reduction

■ The Department argues that it correctly determined that fuel consumed during a commercial motor vehicle's "idle time" must be included as part of a carrier's total fuel consumed figure for the purpose of determining its motor carrier fuel tax liability. "Idle time" refers to the time when a motor vehicle's engine is on, but the vehicle is not moving, so that consumption of fuel is occurring while the vehicle remains stationary.[12] According to the Department, a plain reading of INDIANA CODE § 6–6–4.1–4 does not allow the removal of "idle time" from the road tax calculation formula. However, IFTA defines the taxable event under its provisions to be the "consumption of motor fuels used in the *propulsion* of qualified motor vehicles." IFTA Article III(A) (emphasis added). Arguably, "idle time" does not involve the propulsion of a motor vehicle, so that fuel consumed during idling may not factor into a carrier's road tax liability under IFTA.

■ Per INDIANA CODE § 6–6–4.1–4, Indiana imposes the road tax upon the "consumption of motor fuel by a carrier in its operations" on the state's highways. I.C. § 6–6–4.1–4. This Court, in *Roehl Transport v. Indiana Department of State Revenue*, held that "all fuel consumed by a commercial motor vehicle, regardless of where and how it is consumed, is to be included in the formula for purposes of calculating motor carrier fuel tax liability." *Roehl Transp.*, 653 N.E.2d at 544. This holding included fuel consumed during a vehicle's "idle time" activities. *See id.* Thus, under Indiana law, the Department correctly decided that Hi–Way was required to report the fuel consumed while its vehicles idled. *See also* IND. ADMIN. CODE tit. 45, r. 13–4–4 (2001) (providing example where motor fuel consumed by a vehicle idling as it is unloaded "has been consumed for the purpose of propelling the vehicle along highways").

The issue, however, is whether INDIANA CODE § 6–6–4.1–4 is broader than and therefore in conflict with IFTA Article III(A). If so, arguably, this tax imposition statute would be trumped by IFTA to the extent Indiana does not exclude gallons consumed during "idle time" (i.e., non-propulsion) activities from road tax liability. *See* IND.CODE § 6–8.1–3–14(d).

IFTA imposes no taxes. Rather, its member jurisdictions impose the motor fuels taxes, and IFTA permits the uniform administration and collection of those taxes

---

**12.** Frank A. Bove, President of Hi–Way, stated that one device used on vehicles to measure idle time began measuring idle time when the device sensed "rpm and no revolution on the drive shaft or the wheels." (Bove Dep. at 21.) Bove indicated that idle time might take place when a vehicle is stopped for a train, when drivers wait to unload, or when drivers sleep in their vehicles (and must have the engine idling in order to control the vehicle's interior temperatures). (Bove Dep. at

21, 22 and 24.) *See also Roehl Trans., Inc. v. Wisconsin Div. of Hr'gs and Appeals*, 213 Wis.2d 452, 570 N.W.2d 864, 867 (Ct.App. 1997). (observing that "idling time" fell into two basic categories: (1) "stops on the highway, such as waiting at railroad crossings;" and (2) "off-highway idling, as when drivers would keep engines running while sleeping in order to maintain a comfortable cab temperature").

as they pertain to multi-state carriers. Moreover, IFTA provides no exemptions from what qualifies as taxable fuel except for those exemptions permitted by member jurisdictions. IFTA Article III(A). In short, member jurisdictions determine the scope of their road taxes, while IFTA governs how the jurisdictions administer the taxes. The Court views the road tax imposition language and the IFTA "taxable event" language in light of this relationship. *Cf. Uniden Am. Corp. v. Indiana Dep't of State Revenue,* 718 N.E.2d 821, 828 (Ind. Tax Ct.1999) ("Statutes applicable to the same subject matter should be construed in harmony with one another.") (citation and internal quotation marks omitted).

As used in IFTA Article III(A), the modifying phrase "used in the propulsion" does not prohibit a jurisdiction from imposing a tax on fuel consumed in a carrier's "operations" on the jurisdiction's highways. The phrase explains the general use for which fuel must be consumed under IFTA, not the fuel's specific use at any given time. *Cf. Roehl Trans., Inc.,* 570 N.W.2d at 870. This interpretation is consistent with the Department's presumption that all fuel consumed by a motor vehicle is "solely for the purpose of propelling the vehicle along highways." IND. ADMIN. CODE tit. 45, r. 13–4–4 (2001). The Court will not overemphasize a strict, literal or selective reading of the phrase "used in the propulsion;" to do so would undermine the intended relationship between INDIANA CODE § 6–6–4.1–4 and IFTA, i.e., the former imposes a road tax and the latter administers it. *See Roehl Trans.,* 653

N.E.2d at 542; *Department of State Revenue, Inheritance Tax Div. v. Estate of Hardy,* 703 N.E.2d 705, 710 (Ind. Tax Ct.1998) (concluding "any interpretation of 'belongs to,' as it is used in [INDIANA CODE § ] 6–4.1–2–5, must take into account [the General Assembly's] obvious legislative intent."); *Mynsberge v. Department of State Revenue,* 716 N.E.2d 629, 633 (Ind. Tax Ct.1999) (observing "legislative intent as ascertained from an act or statutory scheme as a whole will prevail over a strict literal reading of any one particular statutory provision").

■ The Court also observes that, if IFTA were interpreted as excluding fuel consumed while idling, it, in effect, would be authorizing another exemption to Indiana's road tax. This result would render meaningless IFTA's adherence to only the exemptions granted by member jurisdictions. The Court will not interpret IFTA in a manner that renders part of it meaningless or absurd. *See Uniden Am.,* 718 N.E.2d at 828; *Dalton Foundries, Inc. v. State Bd. of Tax Comm'rs,* 653 N.E.2d 548, 554–55 (Ind. Tax Ct.1995).

The Court concludes that there is no conflict between IFTA Article III(A) and INDIANA CODE § 6–6–4.1–4. Therefore, as a matter of law, the Department properly concluded that Hi–Way could not reduce its total fuel consumed figures by the number of gallons used by its vehicles while they idled.

## II. Affirmative Defenses

In response to the Department's motion for summary judgment,[13] Hi–Way maintains that the "idle time" issue is inappro-

---

13. Hi–Way argues that *"even if* IFTA permits taxation of non-propulsion fuel use, the Department's "idle time" adjustment against Hi–Way can still be legally barred or limited based upon the doctrines of equitable estoppel and laches, and neither the estoppel issue nor the question of laches may be resolved in a summary judgment context." (Pet'r Opp'n Br. at 17.) (original emphasis). In Hi–Way's motion for partial summary judgment, it requested summary judgment be granted in its favor based upon its contention that IFTA and Section 6 conflict and IFTA should control in favor of Hi–Way. (Pet'r Br. at 13).

priate for summary judgment because there is "conflicting evidence of record that creates issues of material fact ... as to whether the Department is equitably estopped to deny Hi–Way an adjustment for [idle time] activity and/or whether the Department's denial of the adjustment is barred or limited by the doctrine of laches." (Pet'r Opp'n Br. at 7.) Hi–Way's argument is based upon the depositions of Frank A. Bove and James Poe. Bove was President of Hi–Way during the tax years in question. From 1992 to 1995, Poe served as the Deputy Administrator for the Department's Returns Processing Division. From 1984 to 1992, Poe was the Administrator of the Department's Special Tax Division. In that capacity, Poe was responsible for the auditing of the road tax.

The Court will consider Hi–Way's affirmative defenses of equitable estoppel and laches in turn. *See* IND. TRIAL RULE 8(C). First, however, the Court notes that "[i]n a summary judgment proceeding ... the burden of establishing the existence of material affirmative defenses is on the" party raising such defenses. *Paint Shuttle, Inc. v. Continental Cas. Co.*, 733 N.E.2d 513, 519 (Ind.Ct.App.2000), *trans. denied; see also Woods v. Harris*, 600 N.E.2d 163, 165 (Ind.Ct.App.1992). To meet this burden, the party asserting the affirmative defenses must designate evidence demonstrating genuine issues of material fact exist as to the elements of the affirmative defenses. *Huff v. Langman*, 646 N.E.2d 730, 732 (Ind.Ct.App.1995). *Cf. Northern Ind. Pub. Serv. Co. v. Stokes*, 595 N.E.2d 275, 278 (Ind.Ct.App.1992) (stating that defendants were entitled to summary judgment "if undisputed facts without inference favorable to [plaintiff] established each element of equitable estoppel").

### A. Equitable Estoppel

■ Equitable estoppel is a "doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had." BLACK'S LAW DICTIONARY 373 (6th ed. abr.1991). The elements of equitable estoppel are: (1) a representation or concealment of material fact; (2) made by a person with knowledge of the fact and with the intention that the other party act upon it; (3) to a party ignorant of the fact; (4) which induces the other party to rely or act upon it to his detriment. *Salin Bancshares Inc. v. Indiana Dep't of Revenue*, 744 N.E.2d 588, 592 (Ind. Tax Ct.2000) (citing *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237 (Ind.Ct.App.1998), *trans. denied*).

■ "Equitable estoppel cannot ordinarily be applied against government entities." *Metropolitan Dev. Comm'n of Marion County v. Schroeder*, 727 N.E.2d 742, 752 (Ind.Ct.App.2000), *trans. denied; accord Hunt Corp. v. Department of State Revenue*, 709 N.E.2d 766, 781 (Ind. Tax Ct.1999). The reason for this general rule is two-fold. *Samplawski v. City of Portage*, 512 N.E.2d 456, 459 (Ind.Ct.App. 1987). "If the government could be estopped, then dishonest, incompetent or negligent public officials could damage the interests of the public. At the same time, if the government were bound by its employees' unauthorized representations, then government itself, could be precluded from functioning." *Id.* (citing *Gressley v. Califano*, 609 F.2d 1265 (7th Cir.1979)).

■ However, application of the doctrine against the government is not absolutely prohibited. *U.S. Outdoor Advertising, Inc. v. Indiana Dep't of Transp.*, 714 N.E.2d 1244, 1259 (Ind.Ct.App.1999), *trans. denied*. The exception to the general rule exists where the "public interest would be threatened by the government's

conduct." [14] *Metropolitan Dev. Comm'n,* 727 N.E.2d at 742. What constitutes the public interest, however, is not well defined. *Samplawski,* 512 N.E.2d at 459 (noting that "decisions have done little to define when it is that public policy favors rather than opposes the application of estoppel"). To succeed, the party claiming estoppel must identify an "articulable public policy reason which the court determines outweighs the public policy that supports denying estoppel." *Id.*

 Hi–Way must identify an important public policy reason for disregarding the general rule that government entities cannot be estopped. It has not done so in the present case. Hi–Way acknowledges that equitable estoppel "is not favored under Indiana law" but neither identifies nor articulates a reason to ignore the general rule, other than to say that equitable estoppel "is nevertheless a valid defense to Department action if all of its elements can be shown by the taxpayer." (Pet'r Opp'n Br. at 18.) It is true that Hi–Way must demonstrate how the elements of estoppel are met; however, that alone is insufficient. Hi–Way must offer a public policy reason favoring estoppel that is sufficient to counter and outweigh the general rule. Having offered no such reasoning, the Court concludes that the Department is not estopped from rejecting Hi–Way's claim on the "idle time" issue. *See U.S. Outdoor Advertising,* 714 N.E.2d at 1260 (stating that, where company failed "to show how the application of equitable estoppel against [state] would serve the public interest," the Court could find no "compelling reason" to reverse administrative law judge's determination); *Fraternal Order of Eagles, Lodge No. 255 v. Indiana State Bd. of Tax Comm'rs,* 512 N.E.2d 491, 495 (Ind. Tax Ct.1987) (observing that petitioner had "neither shown nor argued that an exception to the general rule [against applying estoppel against the state] should be made and that to do so would be in the public interest"), *rev'd on other grounds,* 521 N.E.2d 678 (Ind.1988); *see also Switzerland County Sch. Corp. v. Sartori,* 442 N.E.2d 702, 704–05 (Ind.Ct. App.1982) (noting that application of equitable estoppel would "circumvent [a] strong public policy and obvious legislative intent" and finding the "expenditure of public funds in the name of equitable estoppel in the instant case to be contrary to public interest").

### B. Laches

 "Laches" is an "equitable defense [that] may be raised to stop a person from asserting a claim that he would normally be entitled to assert." *Storm, Inc. v. Indiana Dep't of State Revenue,* 663 N.E.2d 552, 557 (Ind. Tax Ct.1996) (citing *Haas v. Holder,* 218 Ind. 263, 32 N.E.2d 590 (Ind.1941)). "The rationale behind the doctrine of laches is that a person who, for an unreasonable length of time, has neglected to assert a claim against another waives the right to assert his claim when this delay prejudices the person against whom he would assert it." *Id.* The defense of laches has three elements: (1)

---

**14.** The Court of Appeals, in *Samplawski v. City of Portage,* observed that estoppel may be permitted "when its application will not involve the unauthorized or unlawful use of public funds." *Samplawski v. City of Portage,* 512 N.E.2d 456, 459 (Ind.Ct.App.1987) (citing *City of Crown Point v. Lake County,* 510 N.E.2d 684 (Ind.1987)). Also, according to the Court in *Samplawski,* "estoppel may be permitted where the limitations on governmental authority are not clear and unambiguous, or where the government attempts to take inconsistent positions at different stages of the same proceedings." *Id.* (citing *State ex rel. Agan v. Hendricks Superior Ct.,* 250 Ind. 675, 235 N.E.2d 458 (1968); *Cablevision of Chicago v. Colby Cable Corp.,* 417 N.E.2d 348 (Ind.Ct.App.1981)).

inexcusable delay in asserting a right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) circumstances resulting in prejudice to the adverse party. *Id.; accord Beiger Heritage Corp. v. Kilbey,* 676 N.E.2d 784, 789 (Ind.Ct.App.1997).

To preclude summary judgment, Hi–Way must establish that a genuine issue of material fact exists as to the elements of laches. It has done so. The crux of Hi–Way's argument is that a discussion between Bove and Poe regarding Hi–Way's use of equipment to measure its vehicles' "idle time" activities and the corresponding reduction of Hi–Way's total fuel consumption figures by the gallons used during "idle time" shows that there is a genuine issue of material fact. Bove contends that he met with Poe, who gave him the "okay" to exclude "idle time" fuel. (Bove Dep. at 28.) According to Bove, Poe requested that Hi–Way send him a letter with their first fuel tax filing explaining its method. (Bove Dep. at 28.) Bove asserted that Poe's assurance was the "sole reason" that Hi–Way excluded the "idle time" fuel. (Bove Dep. at 45.) A letter from Hi–Way to Poe, dated January 17, 1989, states that it is enclosing its fourth quarter fuel tax report for 1988 and that it is doing so because it was "the first time [Hi–Way had] taken into consideration idle time. You have had some discussions with Frank Bove concerning idle time. We are hopeful that the enclosed method will meet with your approval." (Poe Dep., Ex. 1.) In contrast to Bove's statements, Poe indicated that he only told Bove that the Department "would consider" allowing reductions for "idle time" fuel consumption. (Poe Dep. at 19.) Poe maintained that the Department's problem with allowing the reductions at the time was "how to be fair to

all the taxpayers in the State of Indiana." (Poe Dep. at 19.) Poe never responded in writing to Hi–Way's letter but may have responded orally. (Poe Dep. at 22–23.)

Essentially, Hi–Way argues that the Department, via Poe, approved of and acquiesced to Hi–Way's reductions for "idle time" fuel consumption. Further, Hi–Way maintains that it was inexcusable for the Department to wait "almost seven full years" (the time between the letter to Poe and the Department's audit of Hi–Way) to enforce its right to collect taxes on fuel consumed during idling activities. This delay, Hi–Way asserts, prejudiced it because, had the Department sought to enforce its rights at an earlier time, Hi–Way would not have excluded the "idle time" fuel from its consumption figures for the tax years in question, would have paid the tax on that fuel, and would not be subject to interest payments now. Hi–Way posits that "[a]t the very least, ... the Department's excessive and unreasonable delay in asserting its claim should preclude it from imposing interest." (Pet'r Opp'n Br. at 24.)

Based upon the evidence presented, the Court concludes that Hi–Way has established a material issue of fact as to whether the Department engaged in "inexcusable" delay in enforcing its right to collect taxes on "idle time" consumption, whether the Department acquiesced to Hi–Way's "idle time" reductions, and whether Hi–Way was prejudiced by the Department's inaction. *See Habig v. Bruning,* 613 N.E.2d 61, 65 (Ind.Ct.App.1993), *trans. denied* (concluding that summary judgment was improper where "several issues of fact must be resolved in order to determine whether the doctrine of laches may properly be invoked"); [15] *cf. Storm,* 663

---

15. There does not appear to be a generally recognized prohibition against enforcing the

laches defense against a government entity; thus, unlike with its equitable estoppel argu-

N.E.2d at 558 (holding that laches did not bar Department from collecting special fuels taxes owed by taxpayer, where no "inexcusable delay" by the Department in assessing taxpayer following audit was shown). Therefore, whether laches bars the Department's collection of the road tax on (and/or the accrued interest associated with) Hi–Way's use of fuel consumed during idling activities during the tax years is a question that this Court must consider in its role as trier of fact. Thus, summary judgment on the issue of laches is DENIED. *See Beiger Heritage*, 676 N.E.2d at 789 (reversing summary judgment in breach of contract action, where party's affidavits raised material factual issue with respect to laches claim, which entitled non-moving party to "submit their causes to the trier of fact").

### III. Tax–Paid Fuel Credit

Hi–Way contends that, as a matter of law, it was entitled to full credit for "tax-paid fuel" for the fuel it purchased in Indiana (and upon which it paid a pump tax) but consumed in a non-IFTA jurisdiction. The Department's audit report explained why it denied Hi–Way credit for the fuel consumed in non-IFTA jurisdictions:

> [INDIANA CODE § 6–6–4.1–6(a)(3) ] mandates that in order for a taxpayer to receive credit for tax paid fuel purchased in Indiana yet consumed in another state or jurisdiction, a similar fuel tax must be remitted to that state or jurisdiction. Such gallons determined not to have been reported to those jurisdictions are termed excess credit gallons and are disallowed for purposes of

Indiana tax paid credit. Upon review of other non-IFTA states' fuel tax reports, it was discovered that disallowed excess credit gallons were present in each quarter of the audit period and are represented in [the Department's] adjustment.

(Stipulation, Ex. A at 5.) Hi–Way proposes two alternative arguments against the Department's application of INDIANA CODE § 6–6–4.1–6 to deny them full credit for tax-paid fuel. Hi–Way first asserts that Section 6(a)(3) "violates the plain, unambiguous, and controlling terms of IFTA and is therefore unlawful and unenforceable against Hi–Way pursuant to Ind.Code § 6–8.1–3–14." (Pet'r Br. at 5.) Second, according to Hi–Way, application of Section 6(a)(3) "is unconstitutional under the Commerce Clause of the U.S. Constitution." (Pet'r Br. at 5–6.)

### A. IFTA Violation

Hi–Way maintains that IFTA requires Indiana to afford it "full credit" for all tax-paid fuel purchased within the state even if Hi–Way consumed the fuel in a non-member jurisdiction. To support its argument Hi–Way relies upon IFTA Article XIII(A), which states that a "licensee shall receive full credit or refund for tax-paid fuel used outside the jurisdiction where the fuel was purchased." Hi–Way argues that Indiana cannot use Section 6(a)(3) to deny it this "full credit" required by IFTA because Section 6(a)(3) and IFTA are in conflict, and therefore, IFTA trumps. Section 6(a)(3) requires a carrier to show that it has paid a "gasoline, special fuel, or road tax" on fuel purchased in Indiana but con-

---

ment, Hi–Way did not have articulate an important public policy reason for applying the laches defense against the Department. *But cf. Harbour Town Assocs. v. City of Noblesville*, 540 N.E.2d 1283, 1287 (Ind.Ct.App. 1989) (agreeing that "public policy interests prohibit a private party from asserting laches against a municipality in the enforcement of its zoning ordinances"); *United States v. Wedzeb Enters., Inc.*, 809 F.Supp. 646, 658 n. 19 (S.D.Ind.1992) ("Equitable defenses, such as laches, typically may not be asserted against the Government when it acts in its sovereign capacity to protect the public welfare.").

sumed out-of-state in order to receive the tax-paid fuel credit for the pump tax paid to Indiana. As noted *supra,* Section I, if an Indiana statute is in conflict with an IFTA Article (or the IFTA Procedures Manual, which is deemed part of IFTA), the IFTA provision may trump Indiana's statute. IND.CODE § 6–8.1–3–14. Specifically, it is Hi–Way's position that neither IFTA nor the IFTA Procedures Manual authorizes a member jurisdiction "to require proof that tax-paid fuel was also taxed upon use outside the [jurisdiction] in which it was purchased." (Pet'r Br. at 10.) Hi–Way contends that because IFTA does not give Indiana the authority to require proof that a tax has been paid, there is a conflict with Section 6(a)(3).

■ IFTA is designed to facilitate the efficient administration and collection of motor fuels use taxes in member jurisdictions. During the tax years in question, not all of the forty-eight contiguous states belonged to IFTA. *See supra* n. 10. IFTA Article VII permits member jurisdictions to impose a pump tax on retail sales of motor fuels and permits credits for the pump tax. IFTA Article XIII(A) states that a "licensee shall receive full credit or refund for tax-paid fuel used outside the jurisdiction where the fuel was purchased." In addition, the IFTA Procedures Manual V(A)(6) provides that "[e]ach jurisdiction will allow full credit for tax paid purchases." However, the last sentence of IFTA Article XIII(A) states that the "base jurisdiction shall allow credits and issue refunds for all of its licensees on behalf of all *member jurisdictions.*" IFTA Article XIII(A) (emphasis added). Further, the Court notes again that one of IFTA's stated purposes is to make "uniform the ad-

ministration of motor fuels use taxation laws with respect to motor vehicles operated in multiple *member jurisdictions.*" IFTA Article I(B) (emphasis added). Another stated purpose is to "enable *participating jurisdictions* to act cooperatively and provide mutual assistance in the administration and collection of motor fuels use taxes." IFTA Article I(C).

From these provisions, the Court concludes that IFTA requires that licensees receive full credits or refunds for tax-paid fuel purchases, only where the fuel was purchased in one *member jurisdiction* and consumed in another *member jurisdiction.*[16] In other words, IFTA does not govern credits or refunds for tax-paid fuel purchases in non-member jurisdictions. IFTA is not applicable here because Hi–Way is seeking a "full credit or refund" for tax paid fuel purchases in non-member jurisdictions. Because IFTA does not govern non-member jurisdictions, there is no conflict between IFTA and Section 6(a)(3) here. Therefore, the Department properly looked to Section 6(a)(3), not IFTA to determine whether Hi–Way was entitled to a credit against the road tax for fuel consumed in non-member jurisdictions. Consequently, Hi–Way was not entitled to "full credit" under IFTA for tax-paid fuel consumed in non-member jurisdictions.

**B. Commerce Clause Violation**

■ Hi–Way argues that application of Section 6(a)(3) violates the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3, which provides in part that Congress shall have the power "[t]o regulate Commerce ... among the several States." U.S. CONST. art. I, § 8, cl.

---

**16.** Hi–Way argues that at least fourteen of the IFTA member jurisdictions in which its vehicles operated during the tax years permitted a full "unqualified" credit for tax-paid fuel, regardless of whether the fuel was taxed by an "out-of-state" jurisdiction. (Pet'r Br. at 12, n. 5.) Section 6(a)(3), as explained *supra,* does not conflict with IFTA. It is irrelevant that other jurisdictions may not have had provisions similar to Section 6(a)(3).

3. It is "designed to create an area of free trade among the states." *Bulkmatic Transp. Co. v. Dep't of State Revenue*, 691 N.E.2d 1371, 1374 (Ind. Tax Ct.1998) (*Bulkmatic II* ) (citing *Boston Stock Exch. v. New York State Tax Comm'n*, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977)). "By its terms, the Commerce Clause is only an authorization for Congress to regulate commerce." *Bulkmatic Transp. Co. v. Department of State Revenue*, 715 N.E.2d 26, 29 (Ind. Tax Ct.1999) (*Bulkmatic III* ). However, there is a "negative or dormant implication" of the Commerce Clause that prohibits taxation by a state in a manner that discriminates against or unduly burdens interstate commerce. *Bulkmatic II*, 691 at 1374 (citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997)). Whether a state tax unconstitutionally discriminates against or burdens interstate commerce will be considered by application of the Supreme Court's four-part test as set forth in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), *reh'g denied.* The *Complete Auto* test provides that a state tax "will survive a Commerce Clause challenge if the tax (1) is imposed on an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce in favor of local commerce, and (4) is fairly related to services the state provides." *Indiana–Ky. Elec. Corp. v. Indiana Dep't of State Revenue*, 598 N.E.2d 647, 656 (Ind. Tax Ct.1992). In examining a state tax, a court "must look not only to the tax, but also to any credits, exemptions or exclusions with that tax." *Bulkmatic III*, 715 N.E.2d at 29 (citing *Maryland v. Louisiana*, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).

Hi–Way attacks the fair apportionment and discrimination parts of the *Complete Auto* test with respect to application of Section 6(a)(3). The Court limits its review to these two parts of the *Complete Auto* test.

### 1. Fair Apportionment

 Hi–Way contends that Section 6(a)(3) violates the fair apportionment requirement because it applies only to the out-of-state activities of an interstate carrier. It is Hi–Way's position that denial of the tax-paid fuel credit requires it to pay additional tax on fuel used outside of Indiana, which effectively "taxes the out-of-state component of an interstate motor carrier's operations." (Pet'r Br. at 15.) To determine whether a tax is fairly apportioned, the Court examines whether it is internally and externally consistent. *Indiana–Ky. Elec.*, 598 N.E.2d at 656 (citing *Goldberg v. Sweet*, 488 U.S. 252, 261, 109 S.Ct. 582, 588, 102 L.Ed.2d 607 (1989)).

 Hi–Way asserts that the application of Section 6(a)(3) only fails to meet the test for external consistency. "External consistency ... looks ... to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S.Ct. 1331, 1338, 131 L.Ed.2d 261 (1995), *reh'g denied* (citations omitted). The external inconsistency test is a "practical inquiry." *Indiana–Ky.*, 598 N.E.2d at 658 (citing *Goldberg*, 488 U.S. at 264, 109 S.Ct. at 590–591.) Hi–Way maintains that "non-payment of tax to another state ... does not justify imposition of an additional ... tax payable to Indiana when the taxed event (out of state fuel use) bears no relation to the taxpayer's activity in Indiana." (Pet'r Br. at 17.)

 Hi–Way is incorrect. Hi–Way was denied a credit against the road tax, which had the practical effect of increasing

its road tax liability to Indiana. The "taxed event" is not, as Hi–Way asserts, its out-of-state fuel use; rather, it is the consumption of fuel upon Indiana's highways. Thus, Indiana taxes only that activity occurring within its borders. As the Court discussed *supra*, Op. at 593–94, the tax-paid fuel credit prevents carriers operating in multiple jurisdictions from double taxation. Section 6(a)(3) merely places a condition on this benefit, i.e., the carrier must have first paid a similar tax to the other jurisdictions. If Hi–Way were permitted to receive the tax-paid fuel credit without having demonstrated that it had paid a tax on the fuel to the jurisdiction in which the fuel was consumed, Indiana's goal of preventing double taxation would be thwarted. Instead, Indiana would receive less than the road tax revenue to which it was entitled, absent any threat of double taxation from another jurisdiction.

Hi–Way was required to demonstrate that application of Section 6(a)(3) violated the fair apportionment requirement of the *Complete Auto* test. It has shown only the risk that it may evade full payment of Indiana's road tax, if the tax-paid fuel credit was allowed; it has not shown a risk of multiple taxation in the constitutional sense. *See Hoosier Energy Rural Elec. Co-op., Inc. v. Indiana Dep't of State Revenue*, 528 N.E.2d 867, 872 (Ind.Tax 1988), *aff'd*, 572 N.E.2d 481, 485 (Ind.1991). Therefore, the Court concludes that application of Section 6(a)(3) does not run afoul of the external consistency test. Consequently, the Court holds that application of Section 6(a)(3) does not violate the fair apportionment requirement.

### 2. Discrimination

Finally, Hi–Way complains that application of Section 6(a)(3) discriminates against interstate commerce because intrastate carriers are afforded "unqualified" tax-paid fuel credit when calculating their road tax liability, while interstate carriers receive the credit only after having satisfied a condition precedent. (Pet'r Br. at 19.) It is Hi–Way's position that Section 6(a)(3) guarantees on its face that motor carriers operating on Indiana's highways will be treated differently "depending upon whether a motor carrier conducts its business wholly within the state or also operates outside the state's borders." (Pet'r Br. at 19–20.)

Section 6(a)(3) does not discriminate against interstate commerce. Intrastate and interstate carriers are treated virtually the same. In calculating its road tax liability, an intrastate carrier simply excludes those gallons upon which it has paid a pump tax. This is not a "credit" per se, because it is not an allowance against the road tax. Rather, it reduces the gallons upon which the road tax is calculated. However, the practical effect is that the carrier receives an automatic credit against its road tax liability. In contrast, to receive the true credit allowed by INDIANA CODE § 6–6–4.1–6, an interstate carrier who purchases fuel in Indiana (and pays a pump tax) but consumes it out-of-state must show that it paid a corresponding tax to the other jurisdictions. Thus, both intrastate and interstate carriers must report their road tax (or equivalent) liabilities to Indiana before receiving any "credit" against those road taxes. For the intrastate carrier, the "report" to Indiana includes the regular quarterly road tax calculation (which excludes those gallons upon which a pump tax has been paid). For interstate carriers, the "report" to Indiana is evidence that tax was already paid to another jurisdiction, as required by the Department. Therefore, interstate and intrastate carriers are treated virtually the same.

Moreover, application of Section 6(a)(3) actually ensures that interstate commerce

is not discriminated against. By requiring carriers to prove that they paid a road (or similar) tax to other jurisdictions, it ensures that carriers pay the same amount of tax and not less tax depending upon whether the carrier chooses to properly report its fuel consumption to a particular jurisdiction. Carriers purchasing their fuel in Indiana are subject to basically the same level of taxation regardless of whether they consume the fuel within Indiana or beyond the state's borders. Section 6(a)(3) cannot be reasonably viewed to discriminate against interstate commerce. Thus, Hi–Way has not met this part of the *Complete Auto* test. *Cf. Bulkmatic III*, 715 N.E.2d at 31. (holding that where effect of PTO exemption penalized those motor carriers outside of Indiana while promoting business in Indiana, exemption violated the Commerce Clause).

Hi–Way has not demonstrated that Section 6(a)(3) fails to meet either the fair apportionment or the discrimination parts of the *Complete Auto* test. Therefore, Hi–Way's claim that Section 6(a)(3) violates the Commerce Clause is without merit.

In summary, Indiana was not required to grant Hi–Way "full credit" under IFTA for tax-paid fuel purchased within Indiana and consumed in a non-member jurisdiction. In addition, Hi–Way has not demonstrated that Section 6(a)(3) violates the Commerce Clause.

## CONCLUSION

The Court holds that, as a matter of law, Hi–Way could not exclude fuel consumed while its vehicles idled from its total fuel consumed figures, in calculating its road tax liability. While Hi–Way has claimed equitable estoppel as an affirmative defense, it has not met its burden of demonstrating that it is in the public interest to equitably estop the Department from denying Hi–Way an adjustment for idle time activity. However, because Hi–Way has demonstrated a genuine issue of material fact with respect to its affirmative defense of laches, the Department's summary judgment motion is DENIED based only upon the laches issue. Therefore, the laches issue will be the only issue to be decided at trial. Further, for the aforementioned reasons, the Court concludes that application of Section 6(a)(3) does not conflict with IFTA and does not violate the Commerce Clause. Therefore, Hi–Way's motion for partial summary judgment is DENIED.